(644 P.2d 467)
No. 52,751

In the Interest of JOHN PATRICK PRICE, A Child Under Eighteen Years of Age.

Opinion filed May 6, 1982.

*Karen Black* and *John Black,* of Black & Black, Lawyers, of Salina, for appellant father, Adrian Willis Price, Jr.

*Mickey W. Mosier,* assistant county attorney, and *Robert T. Stephan,* attorney general, for appellees.

Before PARKS, P.J., ABBOTT and REES, JJ.

REES, J.: This is an appeal from an order severing parental rights. The principal question presented is whether a parent may have his or her parental rights severed when the parent has never had custody of the child. Here, the child was placed in the temporary custody of the State Department of Social and Rehabilitation Services when he was discharged from the hospital on February 15, 1980, nineteen days after his birth. On March 7, 1980, the boy was found to be a deprived child. Thereafter, on October 28, 1980, the parents were found unfit and an order was made permanently depriving them of their rights in their son. During the entire period of slightly more than eight months from hospital discharge to entry of the severance order, the child was in foster care. Only the father has appealed.

Judicial authority to sever parental rights in this case is that granted by K.S.A. 38-824, which provides:

"(a) The provisions of this section shall apply to any child under the age of eighteen (18) years found to be a deprived child, within the meaning of this act . . . .

. . . . .

"(c) When [a parent is] found and adjudged to be unfit to have the custody of such deprived child . . . the district court may make an order permanently depriving such . . . parent, of parental rights . . . ."

The point raised by the father is that the grant of judicial authority is limited to deprivation of parental rights in a deprived child. (See *In re Armentrout*, 207 Kan. 366, 368, 485 P.2d 183 [1971].) K.S.A. 38-824 speaks of parental unfitness to have the custody of a deprived child and K.S.A. 38-820 speaks of an "order or decree permanently depriving a parent of his or her parental rights in a deprived child." Thus, the father in this case posits the issue by asking: Can a child who has never been in his parents' custody be a deprived child?

Statutory definition of a deprived child appears in K.S.A. 38-802(*g*) where it is said:

"(*g*) 'Deprived child' means a child less than eighteen (18) years of age:

"(1) Who is without proper parental care or control, subsistence, education as required by law or other care or control necessary for such child's physical, mental or emotional health, and the deprivation is not due solely to the lack of financial means of such child's parents, guardian or other custodian;

"(2) who has been placed for care or adoption in violation of law;

"(3) who has been abandoned or physically, mentally, emotionally abused or neglected or sexually abused by his or her parent, guardian or other custodian; or

"(4) who is without a parent, guardian or legal custodian."

Subsections (2) and (4) of K.S.A. 38-802(*g*) are obviously inapplicable in this case. Subsection (3) also is inapplicable; the child had not been subject to past abandonment, abuse or neglect by the father.

We are satisfied from the record that the evidence, which we need not reiterate, was more than sufficient to clearly and convincingly prove the father unfit to have the custody of this child, a child prematurely born, possibly retarded, and in need of particular, difficult care. But the present question is whether severance of parental rights requires as a prerequisite that the child be actually subjected to deprivation of proper parental care as referred to in subsection (1) of K.S.A. 38-802(*g*).

According full recognition of the father's interests at stake, he fails to persuade us a child must be subjected to actual parental deprivation in order to find judicial authority to sever parental rights.

In support of his position, the father has relied upon *In re Becker*, 14 Wash. App. 506, 509, 543 P.2d 359 (1975), and *People*

*in Interest of D.L.R.,* _____ Colo. App. _____, 618 P.2d 687, 688 (1980). In response, the State has cited *In re Turner,* 12 Ohio Misc. 171, 231 N.E.2d 502 (1967); *In re East,* 32 Ohio Misc. 65, 288 N.E.2d 343 (1972); and *In Interest of Kester,* 228 N.W.2d 107 (Iowa 1975).

Later events have virtually eliminated the precedential force of the opinions relied on by the father. Each of the two intermediate court of appeals decisions cited has been reversed on review.

The Supreme Court of Washington says in *In re Becker,* 87 Wash. 2d 470, 476, 553 P.2d 1339 (1976):

"In RCW 13.04.010 (2) one of the tests for a 'dependent child' is one 'who has no parent or guardian willing to exercise, or *capable of exercising,* proper parental control'. . . .

"This court has repeatedly stated that the goal of a dependency hearing is to determine the welfare of the child and his best interests. [Citations omitted.] Under the circumstances of this case, the [trial court] should have considered all factors relevant to this issue. It is not excused from fulfilling this responsibility by the absence of a demonstrated custodial relationship between the parent and the child. [Citations omitted.]"

It now has been said and held by the Supreme Court of Colorado in *People in Interest of D.L.R.,* _____ Colo. _____, 638 P.2d 39, 40-42 (1981):

"[T]he court of appeals reversed the judgment of the trial court which held that an infant was dependent and neglected. At the time of birth, the child was placed in the temporary custody of the Denver Department of Social Services. The reversal was premised on the holding of the court of appeals that, 'Because the parents never had custody of, or responsibility for the care of the child, there was and could be no evidence that the child lacked proper care as a result of the acts or omissions of the parents.' . . . Evidence before the trial court clearly showed prospective harm to the child if placed with the parents.

. . . .

"[T]he court of appeals reversed the trial court's judgment, holding that there was insufficient evidence, *as a matter of law,* to sustain the finding of dependency and neglect. We disagree. . . .

. . . .

"Essentially, the issue before us is whether a child may be adjudicated neglected and dependent . . . when the parents have never had custody of the child.

. . . .

"[T]he record establishes that the mother's condition results in a present inability to care for her child, and that such condition will continue indefinitely. The required statutory showing is therefore satisfied. We further note that a neglect or dependency proceeding is preventative as well as remedial. Under the circumstances of this case, requiring that a child be placed with parents in order to

determine whether proper care and control will be provided or that harm would be done to the child, might prove detrimental to the child. Such a course would be in clear contravention of the plain purpose and meaning of the statutes relating to neglect and dependency." (Emphasis added.)

In *In re Turner,* 12 Ohio Misc. 171, the infant daughter of a fifteen-year-old mother with a background of delinquent, criminal and meretricious conduct, was found and held to be a "dependent child" even though she had never been in the custody of the mother. The court held it to be its duty "to interpret the status of the parties with a view to determining whether or not the parent or parents is or are able, physically and emotionally, to provide proper care and support." 12 Ohio Misc. at 174. In the later Ohio Court of Common Pleas opinion, *In re East,* 32 Ohio Misc. 65, a two-day-old child was alleged to be a dependent child. In the opinion we find:

"The second issue, to wit: that the mother cannot be deprived of the custody of her child until she has had the opportunity to prove that she can properly take care of him is likewise not well taken. In *In re Turner,* 12 Ohio Misc. 171, a permanent order of custody of a three-day-old infant was granted on the grounds of dependency, although the mother had not had physical custody of the child. The court reasoned that the mother's unfitness could be predicted from her past history.

"This court agrees that a child should not have to endure the inevitable to its great detriment and harm in order to give the mother an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the mother. The child has been born into a condition and environment that demands his removal from the custody of the mother now. The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.

"Succinctly stated, in a dependency action, where the child's condition or environment warrant it, the child may be removed from the custody of the mother and it is not necessary that she first be given the opportunity to prove that she can properly care for the child." 32 Ohio Misc. at 69.

Similarly, the Iowa Supreme Court held in *In Interest of Kester,* 228 N.W.2d at 110-111, that:

"A termination proceeding is not like a personal injury action where an injury must be proved before damages may be recovered. The termination statute is preventive as well as remedial. The statute mandates action to prevent the probable harm to children and does not require delay until after the harm has been done.

"[Under the] circumstances we cannot gamble with the children's future. They must not be made to await their mother's maturity."

See also *In Interest of Hoppe,* 289 N.W.2d 613, 618 (Iowa 1980); *In re H,* 206 N.W.2d 871 (N.D. 1973); *McGurren v. S. T.,* 241 N.W.2d 690 (N.D. 1976); *Waagen v. R. J. B.,* 248 N.W.2d 815 (N.D. 1976).

We are persuaded the position taken by the supreme courts of Washington and Colorado and in the Ohio, Iowa and North Dakota cases is well founded. No material contrary authority has come to our attention. Further, we find an opinion of our Supreme Court, *Lennon v. State,* 193 Kan. 685, 396 P.2d 290 (1964), a case apparently escaping attention of counsel, which we believe, if not dispositive, supports the trial court decision in this case.

In *Lennon,* there was affirmance of a finding that the child was dependent and neglected, now "deprived," and an order severing the natural mother's parental rights. The child had been placed in the custody of the predecessor of the State Social and Rehabilitation Services shortly after birth. According to the abstract of the record and briefs in *Lennon,* this was fifteen days after the child's birth and upon hospital discharge. The child was in foster care continuously thereafter and never was in the mother's custody.

The mother challenged the sufficiency of the amended petition which alleged the occupation, environment or association of the mother and that which the mother *would* provide, *would be* injurious to the child's welfare. Under the applicable statutes, a dependent and neglected child was defined as a child less than sixteen years old "'whose occupation, environment or association *is* injurious to his welfare'; or '[who] *is* otherwise without proper care, custody or support. . . .' (Emphasis added.)" 193 Kan. at 688. The Supreme Court gave short shrift to the mother's challenge of the amended petition, describing it as a mere quibble over semantics and without substance.

In her brief in *Lennon,* the mother also challenged the sufficiency of the State's evidence. She argued, "The test is this — was the child . . . 'dependent and neglected' as those terms are defined by the statute?" and "none of the State's evidence shows any present effect on the relationship of . . . the child, and the mother." Thus, the following from the *Lennon* decision is particularly instructive:

"The appellant's complaint that error was committed in the admission of remote and irrelevant evidence will be considered in connection with what appears to be

her most serious contentions, *i.e.,* that the trial court erred in overruling her demurrer to the state's evidence and that the court's findings and conclusions were contrary to the law and the evidence. These contentions strike at the [heart] of this lawsuit, and as we examine them, we must ever bear in mind the purpose which underlies the Juvenile Code and the beneficent objectives which the code seeks to attain. *These objectives are well expressed in 38-801, supra, which provides:*

" 'This act shall be liberally construed, to the end that each child coming within its provisions shall receive such care, custody, guidance, control and discipline, preferably in his own home, as will best serve the child's welfare and the best interests of the state. In no case shall any order, judgment or decree of the juvenile court, in any proceedings under the provisions of this act, be deemed or held to import a criminal act on the part of any child; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state. This section shall not apply to proceedings under section 30 [38-830] of this act.'

"The statute is but a legislative expression of the concern which the people of this state have always had for the welfare of children. This court early gave voice to the public feeling in this regard. Speaking for the court in the case of *In re Bullen,* 28 Kan. 781, Justice Brewer posed the paramount question:

" '. . . What will be best for the welfare of the child . . .' (p. 786.)

"Like a vivid, vital strand, this concept of what is best for the child runs through the tapestry woven from our many decisions dealing with child custody, care and placement. . . .

"Little doubt can linger in the mind of one who reads this record that [the child] fairly fits the statutory definition of a dependent and neglected child. A product of illicit love, she would, indeed, face a dismal and distressing future in the only environment which her unfortunate mother appears capable of providing. . . . *The question here is whether the environment surrounding her mother's home would be injurious to [the child's] welfare. . . .*

"No good purpose would be served by again detailing the facts or further recapitulating the evidence. We need only say that we find it difficult to envision a situation which could prove more inimical to a child's chances in life, or more injurious to its future welfare, than that shown to exist in the Lennon menage of which [the mother] is its sole head, counselor and guide." (Emphasis added.) 193 Kan. at 689-690.

K.S.A. 38-801 does not materially differ from G. S. 1961 Supp. 38-801 quoted in *Lennon.*

We conclude and hold a child may be found and held to be a deprived child because he or she is "without proper parental care . . . necessary for such child's physical, mental or emotional health" when the child has never been in his or her parent's or parents' custody. K.S.A. 38-802(*g*)(1). If a parent or the parents of such a deprived child is or are then found and adjudged to be unfit, his, her or their parental rights may be terminated. See *In re Wheeler,* 3 Kan. App. 2d 701, 703, 601 P.2d 15, *rev. denied* 227 Kan. 927 (1979) (rights of one parent may be terminated).

The father, referring to the cited North Dakota case authority, complains "prognostic" evidence the parent will not be able to provide proper parental care within the reasonably near future is lacking. As we see it, the question of future probability is material to the adjudication of unfitness of the parent, not to a finding that the child is a deprived child. In *In re Brooks,* 228 Kan. 541, 550, 618 P.2d 814 (1980), it is said:

" 'Unfit' [has been] defined as 'unsuitable, incompetent, or not adapted for a particular use or service.' *In re Armentrout* [207 Kan. 366], Syl. ¶ 3. Inherent in the term is that the parent is unfit now and in all reasonable likelihood will remain so in the future."

Even if the State's evidence in this case might lack expert prognostic evidence, we are satisfied continued unfitness can be judicially predicted from a parent's past history without expert opinion testimony. The evidence in this case was sufficient for the trial judge to conclude the father was and in all reasonable likelihood would remain unsuitable, incompetent and not adapted for proper parental care of his child.

Not long after the child in this case was found to be and adjudged a deprived child, the father was incarcerated, first in the Saline County jail and later in the Kansas State Industrial Reformatory (KSIR). Although his appointed counsel appeared at all hearings on the question of severance, he was present in person at none. In this context, the father challenges the constitutionality of K.S.A. 38-810a(5), which provides:

"If it appears that a parent of a child who is the subject of a juvenile proceeding is confined in a state penal institution, state hospital, or other state institution, service shall be made by restricted mail to both the confined parent and to the person in charge of the institution. It shall be the duty of the person having charge of the institution to confer with the parent, if the parent's mental condition is such that a conference will serve any useful propose, and to advise the court in writing as to the wishes of such parent with regard to said child."

The challenge made is that by reason of the fact the incarcerated father's participation at the severance hearings was limited by the statute to communication by the persons having charge of KSIR to the court of his wishes with regard to the child, the father was deprived of his constitutional right of confrontation under § 10 of the Bill of Rights of the Kansas Constitution and the Sixth Amendment to the United States Constitution, and his constitutional right to due process under the Fifth Amendment to the

United States Constitution. We need not, indeed we cannot, respond to this challenge. The record on appeal wholly fails to reveal that this issue was raised in the trial court. An issue presented for the first time on appeal will not be considered. *State v. Hornbeak,* 221 Kan. 397, 404, 559 P.2d 385 (1977). Moreover, where constitutional grounds for reversal of a judgment are asserted for the first time on appeal they are not properly brought before the appellate court for review. *State v. Berry,* 223 Kan. 566, 569, 575 P.2d 543 (1978).

It is asserted four written reports of a public health nurse and two social workers were improperly considered hearsay. If for no other reason, the father's complaint as to three of the reports is untenable for the reason that the authors personally appeared; they were available for and were cross-examined during the course of those proceedings; those written reports were admissible hearsay. K.S.A. 60-460(*a*). As to the fourth report, a home study of the father's parents, we find the error harmless under *Kansas Savings & Loan Ass'n v. Rich Eckel Construction Co., Inc.,* 223 Kan. 493, 501-502, 576 P.2d 212 (1978). The paternal grandmother, the principal subject of the home study investigation and source of virtually all the information therein reported, was in attendance at and a witness in the proceedings.

The father's last complaint is that the trial court failed to comply with the following instruction of *In re Brooks,* 228 Kan. at 551:

"The court should carefully consider any particular alternative remedy proposed by an interested party in the case, and if rejected the court should state its reasons for such rejection. The drastic remedy of termination of parental rights should not be utilized unless the court is satisfied there is no realistic alternative and so finds."

The "proposed alternative" suggested by the father was placement of the child in the custody of his parents pending his release from prison. It is clear the father's unfitness as found by the trial court does not stem from the fact he is incarcerated. The unfitness found lies in his abilities, attitudes and conduct, one product of which is his incarceration. We view the proposal of temporary placement with his parents as no true alternative and not within the operation of the *Brooks* instruction.

Finding no reversible error, we affirm.