NOT DESIGNATED FOR PUBLICATION

No. 118,376

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of N.A.K. and L.D.K.,
Minor Children.

MEMORANDUM OPINION

Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed June 22, 2018. Affirmed.

*Jonathan B. Phelps*, of Phelps-Chartered, of Topeka, for appellant natural mother.

*Kyle Edelman*, assistant district attorney, and *Michael F. Kagay*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.

PER CURIAM: T.J.C. (Mother) appeals the district court's termination of her parental rights to her sons, N.A.K., born in 2015, and L.D.K., born in 2013. On appeal, Mother argues that (1) the district court erred by denying an informal request for a continuance; (2) the district court's finding of unfitness was not supported by clear and convincing evidence; and (3) the district court erred by finding that it was in the children's best interests to terminate her parental rights. For reasons more fully set out below, we disagree with Mother's arguments and affirm the district court's decision.

FACTUAL AND PROCEDURAL HISTORY

On January 11, 2016, Mother called Safe Families—a Christian ministry that provides social services to families, especially mothers—and reported that she had been

1

using methamphetamine, that she would use again, and that she had slapped her oldest son. Mother had a previous relationship with Safe Families and had used their services before. The social worker who responded to Mother's call observed a mark on L.D.K.'s cheek near his right ear lobe and informed Mother that she had already used all of the allowed hosting time for her sons that year. As a licensed social worker, the Safe Families representative who met with Mother was a mandated reporter, and she made a report to the Kansas Department for Children and Families (DCF) regarding Mother's statement that she hit L.D.K. and was using methamphetamine. At this time L.D.K. was two years old and N.A.K. was seven months old.

The next day, a DCF social worker conducted a welfare check at Mother's home and also observed an injury to L.D.K.'s face; she described it as a half-inch scratch on his right cheek close to his ear. This social worker tried to address the reported concerns with Mother, but Mother was verbally aggressive, cussing and yelling, and denied striking L.D.K. This social worker asked Mother to complete a urinary analysis (UA) test; Mother did not comply with this request. DCF offered Mother family preservation services, but she elected not to partake in those services.

On January 13, 2016, the State filed petitions in the Shawnee County District Court alleging that N.A.K. and L.D.K. were children in need of care (CINC). On January 15, 2016, the district court entered an order of temporary custody, placing the children in the temporary custody of DCF.

On February 17, 2016, the children were adjudicated CINC as alleged in the petitions after Mother did not contest the allegations in the petitions. On March 14, 2016, the district court entered an order of disposition that the children remain in the custody of DCF and adopted the proposed permanency plan with the goal of reintegration.

The permanency plan included the following 11 tasks to be completed by Mother for the reintegration of the boys into her home: (1) obtain safe, stable housing free from drugs; (2) obtain a verifiable, legal source of income sufficient to meet the needs of the boys; (3) comply with KVC's UA color code system and all requested hair test requests; (4) maintain at least monthly contact with the agency and provide the agency with her current contact information; (5) sign all necessary releases of information needed by KVC to communicate with the professionals in her life; (6) schedule a RADAC assessment to assign her to an appropriate drug treatment program; (7) participate in a RADAC assessment; (8) follow the recommendations of the RADAC assessment; (9) schedule a mental health assessment; (10) participate in a mental health assessment; (11) follow the recommendations of the mental health assessment.

Nearly one year later, on January 12, 2017, the State filed a second amended petition and motion for finding of unfitness and termination of parental rights or appointment of permanent custodian pursuant to K.S.A. 2017 Supp. 38-2266. The district court held a three-day hearing on this motion beginning on June 20, 2017.

At the hearing, several professionals testified, including the Safe Families social worker, the DCF social worker who did the initial welfare check, the KVC case managers, Mother's current pretrial supervisor for her pending felony drug charges, several of Mother's drug addiction counselors, and a psychologist. These individuals testified regarding Mother's tasks on her permanency plan for N.A.K. and L.D.K. The foster mother for the boys' current foster care placement and Mother also testified. The following is a summary of the testimony as it related to the permanency plan tasks to be completed by Mother:

> (1) Obtain safe, stable housing free from drugs. Mother testified that during the pendency of the CINC case she lived in three different locations, two of which were leased in her own name, and that she had utilities connected for all of

3

this time. However, Mother did not provide KVC with a copy of her lease or utility bills. When asked why she did not bring copies to KVC, Mother testified that she "would just space it off."

(2)     Obtain a verifiable, legal source of income sufficient to meet the needs of the boys. Mother testified that, with the exception of a couple of weeks, she was employed throughout the pendency of the case. Yet again, Mother did not provide KVC with any of her pay stubs. Like a copy of her lease and utilities, Mother testified that she did not bring copies of her pay stubs to KVC because she "space[d] it off."

(3)     Comply with KVC's UA color code system and all requested hair test requests. Under KVC's UA color code system, Mother was required to comply with two UA tests per week. Mother either did not show up to comply or tested positive for methamphetamine in approximately 95% of the required UAs. Her plan specifically provided that a missed test would count as a positive result. Mother complied with two hair test requests, both of which were positive for drugs. Mother testified she would rather not show up for a UA test than provide a dirty UA result. Mother showed up only 14 times in 73 weeks of required testing. There were a couple of negative UA results.

(4)     Maintain at least monthly contact with the agency and provide the agency with her current contact information. KVC would go months without hearing from Mother. Additionally, Mother switched phone numbers often, and the agency never knew if their attempts to contact her were going through.

(5)     Sign all necessary releases of information needed by KVC to communicate with the professionals in her life. Mother provided a release from one of her treatment centers to allow KVC to communicate with the professionals

4

helping her. However, there were no releases signed with her other treatment professionals.

(6)     Schedule a RADAC assessment to assign her to an appropriate drug treatment program. Mother scheduled her RADAC assessment.

(7)     Participate in a RADAC assessment. Mother participated in her RADAC assessment.

(8)     Follow the recommendations of the RADAC assessment. Mother began to follow the recommendations of her RADAC assessment. She was required to attend treatment four times a week for three hours. However, she was discharged from treatment centers for lack of attendance.

(9)     Schedule a mental health assessment; (10) participate in a mental health assessment; and (11) follow the recommendations of the mental health assessment. There is no information in the record directly regarding Mother's progress on these tasks. A KVC professional testified that the agency's immediate concern was getting Mother into treatment for her addiction, so that was where efforts were initially focused.

Testimony provided other information about Mother, N.A.K., and L.D.K. Mother had a prior felony burglary conviction from 1999 and had felony drug charges pending against her at the time of trial. The district judge addressed her pending charges, stating: "[M]other is now incarcerated facing criminal charges in a felony drug case. And although she is innocent of those charges until proven guilty, the specter and accusations of continued drug use, as recently as her new arrest, persists." Additionally, Mother previously voluntarily relinquished her parental rights to another child in 2011.

5

Niki Unfred, the KVC case supervisor, testified: "When the kids were initially referred, I felt like, in my professional opinion, that things could go very well." For the first month, Mother was very engaged, but by mid-February 2016, she started losing contact with KVC. Unfred testified to Mother's progress on her case plan, as discussed above. In order for Mother to have visits with her sons, she was required to have two weeks of clean UA tests. Mother received one visit with N.A.K. and L.D.K. in February 2016 but did not receive another visit with her sons until March 2017 during a psychological and parenting evaluation. This evaluation consisted of two visits with her sons. Mother's failure to comply with the UA requirements prevented her visits with her sons. Ultimately, Unfred testified that she believed the termination of Mother's parental rights was in the best interests of N.A.K. and L.D.K. because

> "if mom had shown some progress, even minimal progress, on her case plan, I would not have looked at moving forward with adoption. We don't even know where she's been over half the time in the case. I don't know what she's done. She hasn't had housing. She hasn't had stable employment. She has not kept in contact with the agency. And she is not clean. And I cannot recommend reintegration into a home that I don't feel is safe for these two children. They're too small. They can't fend for themselves."

Finally, Unfred testified that returning N.A.K. and L.D.K. would not be conducive to their well-being because she did not think they would be safe in the home with Mother, she did not feel they would be taken care of, and she did not feel Mother met their basic needs.

Dr. J. Stephen Hazel, a psychologist, testified about the assessment and parenting evaluation he performed on Mother. The assessment and parenting evaluation consisted of Dr. Hazel meeting with Mother on three separate occasions: once with just Mother and then two observations of Mother interacting with her sons. Dr. Hazel testified that Mother certainly cared about her children but that the primary issue was her substance abuse history and the resulting difficulty with parenting and stability. Dr. Hazel

characterized Mother's addiction issues as the major risk factor in Mother's life. He believed that she was aware of the effects of her substance abuse. He testified that there were no issues with Mother's parenting skills and ability to relate to the boys and that she had the ability to be a good parent. However, in order for her to do this, the key was abstaining from substance abuse and that treatment was critical. Finally, he testified that if she could address her substance abuse issues in a substantive way, she was capable of parenting the children.

Tonja McCollam, an infant mental health specialist, also testified at trial. She worked with N.A.K. and L.D.K. in their foster home for one to two hours a week providing developmental and social-emotional support to the boys. She performed two assessments on each of the boys—one for developmental benchmarks and another of social and emotional benchmarks. Both N.A.K. and L.D.K. fell within the developmentally normal range of the assessment, which screened for skills in communication, gross motor skills, fine motor skills, problem solving, and personal and social skills. However, on the social-emotional support screening, which assessed attachment relationships, self-regulation, ability to self-sooth, sleeping patterns, and toilet issues, both N.A.K. and L.D.K. qualified for additional support. McCollam testified that L.D.K. was "off the charts" in his need for extra support based on his social-emotional screening. N.A.K. also qualified for additional support, but his score was not nearly as significant as L.D.K.'s.

McCollam testified that L.D.K. was very hard to soothe and impulsive. He was also aggressive and had issues with hitting, yelling, screaming, and crying. L.D.K. showed an inability to regulate his emotions that was beyond what was typical for a child his age. N.A.K.'s behavioral issues were less severe and, in McCollam's opinion, they were mimicked behaviors from his older brother. Through McCollam and the foster placement's work with the boys, the frequency and duration of the tantrums have decreased, and their ability to regulate their emotions and express their needs has

7

increased. However, after N.A.K. and L.D.K.'s visits with their mother at Dr. Hazel's office, both boys showed dysregulation in their behaviors. McCollam also testified that she was not provided N.A.K. and L.D.K.'s entire history; however, generally,

> "kids who seem to not regulate hardly at all have been exposed to something traumatic, whether it be drug exposure or domestic violence. . . . [T]hey've been exposed to something and needs not being met. And I would say that had to have happened prior to foster care placement for those needs to be as significant as they are."

But, she acknowledged that some of their behaviors could also be affected by being removed from Mother's care. Finally, she testified that the boys needed a stable, consistent, and structured environment with limit setting and follow through.

Mother testified that she reached out to Safe Families to get help with L.D.K. and that she may have "exaggerated" that she hit him because "it seemed like nobody understood where she was coming from" in trying to get help with her addiction. She testified: "So I may have over exaggerated, but I did not hit my son." She testified that she has struggled with methamphetamine addiction since 2011 and that she successfully completed treatment for her addiction once before. Mother testified that she had two leases during the pendency of the case and then stayed with a family friend and at the Mission after those leases ended. Yet, KVC was never supplied with copies of her leases. She said she put her job and housing before her addiction treatment and that she now regrets that decision. She discussed in detail the different jobs she had in the nursing field during the pendency of the case. Again, however, she never provided KVC with proof of employment because she would "just space off" bringing in her pay stubs. She discussed that she was given a car by a member of her church congregation; however, she gave that car away to a friend. She reiterated multiple times that she needed help with her addiction. When asked what additional services KVC could have provided her to help with her addiction, she testified: "[Just be] more encouraging. A smile, to be motivating

8

and positive, . . . understanding and compassionate. That can do so much for a person." She also expressed how much she loves her sons and that she is a good mother to them. At the conclusion of her direct testimony the following exchange occurred:

"[MOTHER'S ATTORNEY]: [I]f you could ask the Judge, and you've already asked me this, but if you could ask [*sic*] the Judge one thing, what would it be?

"[MOTHER]: Please give me a little more time to prove myself, and can I say it? That if I cannot get my stuff together, . . . I would be in agreement with everybody, like if I—if I've come this far and I've been through so much and I can't get it together, that maybe somebody else should raise my children. And having met that woman, I am very grateful they're in a good home. And if that's where they would stay, I would willingly sign over my rights.

"[MOTHER'S ATTORNEY]: How much time do you think is fair?

"[MOTHER]: I could do it in three months, but I would ask for six, just because I'm human, and you know, I—I—I feel like even at work, I'm one of those. Like, when I was a charge nurse, and like, I was one of those people that I'm all in, like I take pride in what I do, you know, and I'm all for it. And when I have . . . support like that and I'm feeling good, I know I can do it, but I'm human. So I would ask for six, but I believe . . . I could show a change in three months, because I would go straight to in-patient."

At the conclusion of the hearing, in open court, on June 22, 2017, the district court entered its findings and orders with regard to the State's motion. The court stated there was no doubt that Mother loved her children deeply but that this case was not about Mother's love for her children, it was about the impact her mental health and, principally, her drug addiction have on her ability to "effectively and adequately care for and nurture and rear" her children. The district court emphasized that addiction was the main issue preventing Mother from parenting her children, yet:

9

"[t]here was no commitment to attend treatment and she had an inability to remain abstinent. That indicated to the Court, after several attempts at treatment . . . through the years, that mother cannot demonstrate an ability to change herself or her future behavior. It appears to the Court mom was not willing to change her lifestyle."

The court further discussed:

"Throughout the life of these cases and during this trial, mother has repeatedly said that she needs and wants help, but when those opportunities for help and structure are offered to her, like through a Court-approved case plan, containing reintegration tasks developed in conjunction with her by the agency, to reintegrate children in her home, she does not follow through with even the simplest of tasks, like [UAs], providing documentation. She claims repeatedly that she has, in her immediate possession, her proof of employment or safe and stable housing. And when she does engage, it's often when the options to redeem her situations have passed.

"When she was asked by the State, again, quote 'What more can the agency do to help you' end quote, she replied with quote 'smile, compassion, be more supportive' or words to that effect. In effect, give me moral support, but by implication, she's admitting that the agency has provided all sorts of support and plans where she has provided less than the minimal compliance."

The district court went through each witness' testimony in detail and then found that the evidence presented, when viewed in its totality, supplied clear and convincing support for a finding that Mother was unfit under several subsections of K.S.A. 2017 Supp. 38-2269(b) and (c).

The district court then found that Mother's conduct or conditions causing her unfitness were not likely to change in the foreseeable future. The court then stated that viewing the case in child time—where L.D.K. has spent one-third of his life in foster care and N.A.K. has spent two-thirds of his life in foster care—combined with Mother's long history of drug and mental health issues that continue to occur without successful redress,

10

the boys' dysregulation after visits with Mother, the boys' need for an ongoing and consistent home, and their current physical, mental, and emotional state, that the evidence supported a termination of Mother's parental rights. Finally, the district court stated that it was "imperative that these children find permanence and nurturing, stable homes in order to provide them with structure, guidance, love, support, medical and psychological treatment" and because of this, termination of Mother's rights was in the best interests of N.A.K. and L.D.K.

Mother timely appeals the finding of unfitness and termination of her parental rights.

### DOES CLEAR AND CONVINCING EVIDENCE SUPPORT THE DISTRICT COURT'S UNFITNESS FINDING?

Mother argues that the district court erred in terminating her parental rights to N.A.K. and L.D.K. It appears from her brief that she has several interwoven arguments: (1) the district court failed to use the proper definition of "unfit"; (2) the district court did not consider Dr. Hazel's testimony; (3) the district court was without sufficient facts to support a finding that Mother was unfit by conduct or condition and that the conduct or condition was unlikely to change in the future; and (4) the district court abused its discretion by finding it was in the best interests of the children to terminate Mother's rights instead of granting a permanent custodianship. Rather than address each of Mother's arguments in order, we will discuss her arguments within the structure of the proper steps a district court must take in order to terminate a parent's rights.

When we review a district court's termination of parental rights, we consider "whether, after review of all the evidence, viewed in the light most favorable to the State, [we are] convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated]."

11

*In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In *In re B.D.-Y.*, our Supreme Court explained that "clear and convincing evidence" requires the factfinder to believe "that the truth of the facts asserted is highly probable." 286 Kan. at 697. "[T]he appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

Once a child has been adjudicated a CINC, termination of parental rights is governed by K.S.A. 2017 Supp. 38-2269. A district court may terminate the rights of a natural parent when it finds by clear and convincing evidence that (1) the parent is unfit and unable to properly care for the child; (2) the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future; and (3) termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(a), (g)(1); *In re D.H.*, 54 Kan. App. 2d 486, 488, 401 P.3d 163 (2017).

A. *Mother is unfit and unable to properly care for the children.*

Under K.S.A. 2017 Supp. 38-2269(b), the following factors are among those that can be considered to determine a parent's unfitness:

"(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;

"(2) conduct toward a child of a physically, emotionally or sexually cruel or abusive nature;

"(3) the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;

"(4) physical, mental or emotional abuse or neglect or sexual abuse of a child;

"(5) conviction of a felony and imprisonment;

"(6) unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death;

12

"(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

"(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

"(9) whether the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply."

Further, K.S.A. 2017 Supp. 38-2269(c) requires that when a child is not in the physical custody of a parent the district court shall consider, but is not limited to, the following:

"(1) Failure to assure care of the child in the parental home when able to do so;

"(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

"(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home; and

"(4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay."

Any one of the above factors alone may establish grounds for the termination of parental rights. K.S.A. 2017 Supp. 38-2269(f). Finally,

"[a] parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237, *rev. denied* 286 Kan. 1177 (2008).

A review of the record on appeal, in the light most favorable to the State, indicates that there was clear and convincing evidence supporting the district court's finding that Mother was unfit under the following factors:

13

- K.S.A. 2017 Supp. 38-2269(b)(1)—"Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child." By her own admission and testimony from Dr. Hazel, Mother suffered from depression.

- K.S.A. 2017 Supp. 38-2269(b)(3)—"[T]he use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." Mother has struggled since 2011 with her methamphetamine addiction. Although she has had periods of remission, she continues to relapse.

- K.S.A. 2017 Supp. 38-2269(b)(4)—The "physical, mental or emotional abuse or neglect or sexual abuse of a child." Although Mother testified that she "over exaggerated" hitting L.D.K., the district court apparently did not find this testimony credible and found that an instance of physical abuse with one of the boys occurred.

- K.S.A. 2017 Supp. 38-2269(b)(5)—The "conviction of a felony and imprisonment." Mother had a prior felony burglary conviction.

- K.S.A. 2017 Supp. 38-2269(b)(7)—The "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." Several efforts made by the agency to rehabilitate the family were unsuccessful, including providing Mother with multiple drug addiction treatment opportunities at several different treatment centers.

14

- K.S.A. 2017 Supp. 38-2269(b)(8)—A "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Mother did not take the appropriate steps in her drug addiction treatment to adjust her circumstances. She was discharged from programs for poor attendance, admitted to using drugs during the pendency of the CINC case numerous times, and did not comply with approximately 95% of her required UAs.

- K.S.A. 2017 Supp. 38-2269(c)(2)—The "failure to maintain regular visitation, contact or communication with the child or with the custodian of the child." Mother only had three visits with N.A.K. and L.D.K. in approximately 17 months because she could not or would not comply with KVC's color code UA system.

- K.S.A. 2017 Supp. 38-2269(c)(3)—The "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." Mother failed to make even minimal progress on her case plan and completed only two of her eleven case plan tasks—scheduling a RADAC assessment and completing a RADAC assessment. Even though she claimed she had housing and a job during the entire case—with the exception of a couple of weeks—she failed to provide any of the required housing or income documentation to KVC.

Mother appears to argue the district court used the incorrect definition of "unfit" when making its finding that there was clear and convincing evidence to support that Mother was unfit and unable to properly care for the children. However, Mother cites cases that discussed the definition of unfitness before the current codification of K.S.A. 2017 Supp. 38-2269. Additionally, her brief does not elaborate as to how the district court erred in its definition of unfitness. As an issue not briefed by the appellant is

15

deemed waived or abandoned, we find that Mother has waived her argument that the district court used the wrong definition of "unfit" in its findings. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Further, when making its determination of unfitness, the district court considered the factors specifically enumerated by the Legislature. Therefore, the district court did not apply the wrong unfitness definition.

Mother also argues that the district court did not consider Dr. Hazel's assessment when determining that Mother was unfit. However, when reviewing the facts and testimony presented during the trial, the district judge specifically referenced Dr. Hazel's testimony:

> "[Mother] is in the very early stages of trying to stay away from drug use. That she's in the early stages of—or early remission on her substance dependence. That substance abuse affects her stability and ability to parent her children. That was from an expert in this case. That Dr. Hazel testified substance abuse keeps interfering with her ability to parent her children. It causes instability to provide a home and provide good judgment related to her children. Dr. Hazel, I believe, in cross-examination, indicated that [Mother] recognizes she has substance abuse and it affects her ability to parent her children, but she can't stay away from drugs. . . . [M]other is capable of parenting her children, but it's conditioned. She has to do certain things that are recommended, which includes not using drugs."

Unfortunately, Mother did not demonstrate to the district court that she could prevent her substance abuse from interfering with her parenting, as she failed to follow through with her treatment and continued to use drugs during the pendency of the CINC case. In fact, at trial Mother admitting to using methamphetamine as recently as Mother's Day—May 14, 2017—a month before trial. Mother now asks us to reweigh Dr. Hazel's testimony; however, that is not our role. See *In re B.D.-Y.*, 286 Kan. at 705. The district court did consider Dr. Hazel's testimony in its finding of unfitness.

16

After a review of the record, we find there was clear and convincing evidence to support the district court's finding that Mother was unfit by reason of conduct or conduct which rendered Mother unable to properly care for the children, and the district court did not err in this finding.

B.  *The conduct or condition rendering Mother unfit is unlikely to change in the foreseeable future.*

Clear and convincing evidence must support the district court's finding that the conduct or condition rendering Mother unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). "The 'foreseeable future' should be viewed from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008). See *In re L.B.*, 42 Kan. App. 2d 837, 842, 217 P.3d 1004 (2009), *rev. denied* 289 Kan. 1278 (2010) ("[C]ourts must strive to decide these cases in 'child time' rather than 'adult time.'"). Finally, Mother's past conduct may be used as an indicator of her future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App.) (unpublished opinion), *rev. denied* 302 Kan. 1010 (2015) ("Parental unfitness can be judicially predicted from a parent's past history.").

Based upon "child time," when these facts are viewed in totality, there was sufficient evidence before the district court to support its finding that there was not a likelihood that Mother's condition or conduct rendering Mother unfit would change within the foreseeable future. Although Dr. Hazel testified that Mother would be a successful parent if she was able to get her addiction to methamphetamine under control, Mother was using as recently as a month before trial. She was given several opportunities for treatment, yet she did not avail herself of any of these opportunities and was discharged for failure to attend. Mother testified that she focused on her housing and job rather than her treatment, yet she failed to provide any documentation either to KVC or at

17

trial that she was in fact employed and had adequate housing. Further, when considering child time, Mother has struggled with drug addiction for the entirety of N.A.K. and L.D.K.'s lives; in fact, her addiction struggle began in 2011, even before the boys were born. At the time of trial, L.D.K. had spent one-third of his life in foster care and N.A.K. had spent two-thirds of his life in foster care. Finally, Mother's past actions may be used to predict her future behavior, and Mother's history with drugs, as recently as a month before trial, indicate that her failure to commit to her treatment would not change. See *In re Price*, 7 Kan. App. 2d at 483. In the perspective of the children's time, there was sufficient evidence to support the district court's finding that the conduct and conditions rendering Mother unfit were unlikely to change in the foreseeable future.

C.      *Termination of Mother's parental rights is in the best interests of the children.*

Finally, a district court must determine whether termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269(g)(1). "[T]he district court is in the best position to make findings on the best interests of the child, and its judgment will not be disturbed in the absence of an abuse of judicial discretion." *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010), *rev. denied* October 7, 2010. When considering whether terminating parental rights is in the best interests of the child, the "court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2017 Supp. 38-2269(g)(1). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) is based on an error of law; or (3) is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

> "'[A] child should not have to endure the inevitable to its great detriment and harm in order to give the mother an opportunity to prove her suitability. . . . The law does not require the court to experiment with the child's welfare to see if he will suffer great

detriment or harm.'" *In re Price*, 7 Kan. App. 2d at 480 (quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 [1972]).

Here, Mother has failed to establish that the district court abused its discretion in finding it in N.A.K. and L.D.K.'s best interests to terminate Mother's parental rights. Although this is a difficult case because Mother has the skills to parent, she continues to let her drug addiction interfere with those skills. The sad truth is Mother continues to use illegal drugs and is not taking advantage of the treatment opportunities provided to her. Additionally, the KVC case manager testified that in her professional opinion termination was in the best interests of the children because Mother had failed to make even minimal progress on her reintegration plan. In considering N.A.K. and L.D.K.'s best interests, the district court held:

> "The Court deems it is important and imperative that these children find permanence and nurturing, stable homes in order to provide them with structure, guidance, love, support, medical and psychological treatment. Those needs can best be provided by parents or parental figures that place the children's needs above their own.

> "This Court finds it is in the children's best interest to terminate mother's parental rights, because she has not now nor will ever be capable of providing the level of care sufficient for her emotional, physical—or their emotional, physical, and psychological health."

Mother argues that the district court should have granted a permanent custodianship instead of terminating her parental rights, yet she fails to provide any legal support for this argument; she simply states that such an arrangement would have allowed her to continue to have contact with her children. However, "'a child should not have to endure the inevitable to its great detriment and harm in order to give the mother an opportunity to prove her suitability.'" *In re Price*, 7 Kan. App. 2d at 480. The district court took into consideration the emotional, physical, and psychological needs of the

19

boys, their need for permanence in a stable home, and the recommendations of the professionals closest to the case. Based on the entirety of the record on appeal, the district court did not abuse its discretion in holding that termination of Mother's parental rights was in the best interests of N.A.K. and L.D.K., and the district court did not err in terminating Mother's parental rights.

Affirmed.