NOT DESIGNATED FOR PUBLICATION

No. 121,313

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of L.H. and L.H. II,
Minor Children.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed November 22, 2019. Affirmed.

*Debera A. Erickson*, of Kansas City, for appellant natural mother.

*Ashley Hutton*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before MALONE, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM:  Mother appeals the district court's order terminating parental rights to her children L.H. and L.H. II. Specifically, she challenges the district court's findings that her current unfitness is unlikely to change in the foreseeable future and that termination is in the best interests of the children. Finding no error, we affirm.

FACTS

Mother is the natural mother of L.H., born in 2008, and L.H. II, born in 2011. In 2014, the State initiated child in need of care (CINC) proceedings for both children due to Mother's long history of substance abuse, mental health issues, and unstable living situation. The children were placed with their maternal great-grandmother during most of the time the CINC case was pending.

1

Mother regained custody of her children on July 31, 2017, approximately three years after the CINC proceedings were initiated. In August 2017, Mother tested positive for Oxycontin and struggled to produce documentation of her prescription for the medication. In September 2017, Mother and the children were evicted. The court cases were closed by journal entry dated December 12, 2017. In January and February 2018, Kaw Valley Center (KVC) aftercare staff reported that Mother was not responding to their attempts to reach her.

On March 20, 2018, Mother called the Kansas City, Kansas, Police Department, reporting that she heard noises in the attic of her home and believed she was in danger. When the police arrived, Mother became combative and was arrested for battery of a law enforcement officer and child endangerment because L.H. and L.H. II were in the home during the incident. Mother later admitted she had taken something while hanging out with friends at a family barbecue the night before and, when mixed with her medication, it made her delusional. She admitted to police that she was using marijuana at the time as well. In light of Mother's arrest, the children were placed with their maternal grandmother as a temporary safety plan.

A social worker with the Kansas Department for Children and Families (DCF) interviewed the children on April 23, 2018. Both children confirmed that they were at home that evening and "in the middle of the night" their mother was taken away by the police. The DCF social worker attempted to interview Mother, but she declined to be interviewed. The social worker asked KVC aftercare staff for assistance in getting Mother interviewed, but KVC reported Mother was unwilling to talk to KVC staff as well. KVC staff reported that Mother currently was testing positive for multiple drugs and that Mother had been directed to get a drug assessment but, as of April 20, 2018, Mother had not done so.

On April 24, 2018, the State filed an Application for an Ex Parte Order of Protective Custody and a CINC petition for each of the two children. Mother ultimately stipulated to the fact that both L.H. and L.H. II were children in need of care. Specifically, Mother admitted that she had drugs in her system when the CINC petition was filed, that she needed (and was presently enrolled in) a drug treatment program, and that she had mental health issues for which she needed to continue pursuing treatment and taking her medications. On July 27, 2018, the district court accepted Mother's stipulations, found the children to be in need of care, and held reintegration remained a viable option in both cases. In conjunction with these findings, the district court adopted the following interim orders:

"1)  That the subject minor child(ren) shall be in the custody of Kansas Department for Children and Families who shall have the authority to consent to the performance and furnishing of hospital, medical, surgical or dental treatment or procedures, pursuant to [K.S.A.] 38-2217;

"2)  That visitation shall be at the discretion of KVC personnel until further order of the court;

"3)  That the mother shall obtain initial/family assessments and follow the recommendations;

"4)  That the mother shall sign the necessary releases of information;

"5)  That the mother shall obtain and/or maintain stable income and provide verification;

"6)  That the mother shall obtain and/or maintain stable housing and provide verification;

"7)  That the mother shall contact the CSO once a month and/or prior to address or phone changes;

"8)  [Crossed out by the district court];

"9)  That [Mother] shall submit timely, random, negative [urinalysis tests] and/or breathalyzers to the CSO and KVC, provide all prescribed medications to the CSO and KVC;

"10)  That [Mother] shall participate in a drug and alcohol assessment and follow the recommendations;

3

"11) That [Mother] shall participate in a mental health assessment and follow the recommendations."

On October 29, 2018, the district court conducted a review hearing and kept the interim orders in place. On December 28, 2018, the State moved to terminate Mother's parental rights in both cases, alleging Mother had failed to comply with most of the district court's orders. Specifically, the State claimed that Mother: (1) failed to provide proof of stable income, (2) was living with a known drug felon, (3) was discharged unsuccessfully from a drug treatment program in October 2018, (4) failed to complete a mental health assessment, and (5) either failed to appear or submitted positive urinalysis (UA) drug tests.

The termination hearing was held on February 13, 2019. The State called Mother's Court Services Officer (CSO), Ramona MacDougall, as a witness. MacDougall had served as Mother's CSO since the initiation of the 2014 CINC cases and had been working with the family for almost four years. MacDougall testified that Mother did not provide any direct verification of her employment. Instead, Mother provided MacDougall with a letter from KVC that previously had been submitted in the 2014 CINC cases. This letter indicated that Mother provided in-home health services to a disabled man. Somebody had "updated" the letter for the current CINC cases by crossing out the original date and writing in 2019. Mother also provided MacDougall a single pay stub from a temporary employment agency for July/August 2018. MacDougall noted, however, that the name of the temporary employment agency on the pay stub was not the same as the agency Mother claimed she worked for.

Regarding Mother's housing, MacDougall testified that she received an expired lease agreement and was unsure if Mother had signed a new lease or was on a month-to-month arrangement. Although Mother claimed that she lived alone, MacDougall testified that KVC workers had seen mail addressed to Mother's boyfriend, Daron Easley, at

4

Mother's residence. Easley was a known felon who had been convicted of multiple drug offenses. As a result of those convictions, Easley was required to register as a drug offender. When MacDougall checked the offender registry, she found that Easley had listed Mother's address as his home address. This concerned MacDougall not only because L.H. and L.H. II potentially would be living with a convicted drug felon but also because of Mother's own extensive history with substance abuse. MacDougall said she attempted to conduct an initial assessment with Easley on three separate occasions but was unsuccessful.

Finally, regarding Mother's history of mental health issues and drug use, MacDougall testified that Mother failed to provide verification to show that she had completed a mental health assessment or a substance abuse treatment program. MacDougall also testified that she requested five UA tests from Mother over the course of the current CINC cases, but Mother failed to appear for three of those tests. The UA tests that Mother did submit to MacDougall tested positive for marijuana, oxycodone, and benzodiazepines.

MacDougall testified that KVC had made attempts to obtain UA tests from Mother as well, but Mother failed to appear on any of the eight dates that she was called in. KVC also placed Mother on its color code system, but Mother failed to appear on 32 out of the 36 dates that her color was called. The four times she did appear, Mother tested positive for amphetamines, methamphetamines, cocaine, marijuana, oxycodone, and benzodiazepines. Similarly, the five UA tests that Mother submitted to KVC aftercare specialists tested positive for marijuana and oxycodone. And finally, MacDougall testified that on the day of the termination hearing, Mother submitted a UA test that tested positive for marijuana and oxycodone.

Mother also testified at the termination hearing and largely confirmed MacDougall's testimony about her continued drug use as well as her positive and missed

UA tests throughout the CINC proceedings. Mother also admitted that she had not yet completed her substance abuse treatment or mental health/drug assessments but claimed that she had just received her Medicaid card and was therefore planning on getting those tasks done in the near future. Notably, Mother received her Medicaid card because, at the time of the termination hearing, she was five months pregnant. Mother identified Easley as the father of her unborn child—and admitted that he used her address as a mailing address—but denied that he was living with her and claimed that she was unaware that Easley had listed her address on his drug offender registration. Finally, Mother testified that she was working for a disabled man as an in-home health services provider as well as for a temporary employment agency, on an on-call basis, as a warehouse worker.

The children's maternal great-grandmother was the only other person to testify at the termination hearing. She confirmed that L.H. and L.H. II were placed with her and that she had been the primary caregiver for both children for almost five years. In that time, great-grandmother noted that Mother had attempted to interrupt and interfere with how she took care of the children. Mother typically did so by texting and calling L.H. incessantly and at all hours, including throughout the night when L.H., who was 10 years old, was supposed to be sleeping. When great-grandmother attempted to limit this communication, Mother sent her nasty and threatening text messages. One of those text messages purportedly stated that Mother would instruct L.H. to kill great-grandmother in her sleep. Mother later contested the exact wording of those text messages but did not contest the fact that she had sent them.

After hearing all of the testimony, the district court found that Mother's conduct or condition rendered her unfit to properly care for L.H. and L.H. II and that this conduct or condition was unlikely to change in the foreseeable future. In light of the physical, mental, and emotional needs of L.H. and L.H. II, the district court also held that termination of Mother's parental rights was in the best interests of both children. Based

6

on those findings, the district court terminated Mother's parental rights and ordered L.H. and L.H. II into the State's custody. Mother now timely appeals that termination.

ANALYSIS

Mother does not appear to contest that presently, her conduct or condition renders her unfit to properly care for her children. Instead, she argues that the district court erred when it found by clear and convincing evidence that the conduct or condition rendering her unfit is unlikely to change in the foreseeable future and that termination of her parental rights is in the best interests of the children.

When a child has been adjudicated a child in need of care, a district court may terminate parental rights if it finds by clear and convincing evidence that a parent's conduct or condition renders him or her unfit to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2018 Supp. 38-2269(a). In making that determination, a district court must consider a nonexclusive list of statutory factors, any one of which, standing alone, may establish grounds for termination. K.S.A. 2018 Supp. 38-2269(b)-(c), (f). After making a finding of unfitness, a district court also must consider whether termination of parental rights is in the best interests of the child. K.S.A. 2018 Supp. 38-2269(g)(1). In making that determination, the district court must "give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2018 Supp. 38-2269(g)(1).

1. *Foreseeable future*

When an appellate court reviews a district court's decision to terminate parental rights, it considers whether, when viewing the evidence in the light most favorable to the

7

State, "a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011); see *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Appellate courts do not, however, reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. As noted above, Mother does not appear to contest that she is presently unfit. Therefore we must only decide whether, when viewed in a light most favorable to the State, there is clear and convincing evidence that Mother's unfitness is unlikely to change in the foreseeable future. See *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) ("When a litigant fails to adequately brief an issue it is deemed abandoned.").

Kansas courts consistently hold that what constitutes the "foreseeable future" must be evaluated from the child's perspective, not the parent's. *In re C.C.*, 29 Kan. App. 2d 950, 954, 34 P.3d 462 (2001). Children perceive time differently than adults do and therefore courts must strive to decide cases in "'child time'" rather than "'adult time.'" *In re L.B.*, 42 Kan. App. 2d 837, 842, 217 P.3d 1004 (2009); see *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008) ("[A] child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time."). Further, district courts may look to a parent's past conduct as an indicator of future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

The district court based its finding of unfitness on the following statutory factors:

> "Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental and emotional needs of the child, [K.S.A. 2018 Supp.] 38-2269(b)(1);
> "The use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child, [K.S.A. 2018 Supp.] 38-2269(b)(3);

8

"[F]ailure of reasonable efforts by appropriate public or private agencies to rehabilitate the family, [K.S.A. 2018 Supp.] 38-2269(b)(7);

"[L]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child, [K.S.A. 2018 Supp.] 38-2269(b)(8)."

Again, Mother does not contest that there is clear and convincing evidence supporting the district court's finding that each of the above factors are present in this case and currently render her unfit to properly care for her children. Instead, she argues that there was not clear and convincing evidence to show that those factors would remain present in the foreseeable future.

Regarding the first factor—that Mother was unfit due to her emotional or mental illness, mental deficiency, or physical disability—Mother argues that she received a Medicaid card a few weeks before the termination hearing and therefore could afford to get a mental health evaluation. But Mother admitted that she only received the Medicaid card due to her pregnancy. It is therefore unclear how, if at all, Mother will be able to continue mental health treatments after the pregnancy is over. Further, the mental health evaluation is only the first step in the treatment process. Mother had been involved in these current CINC cases for more than nine months and still had not completed a mental health evaluation. This fact weighs against Mother's argument that she will be able to successfully manage the symptoms of her mental illness in the foreseeable future, particularly when that future is considered within the context of "child time." See *In re L.B.*, 42 Kan. App. 2d at 842; *In re C.C.*, 29 Kan. App. 2d at 954.

Regarding the second factor—that Mother was unfit due to the use of intoxicating liquors, narcotics, or dangerous drugs—Mother claims she had stable housing and employment and also had a drug and alcohol evaluation scheduled for a few days after the termination hearing. Mother also claims she successfully stopped using drugs and got her kids back before, in the 2014 CINC cases, and therefore "there was no reason to

9

believe that she could not be successful again in the foreseeable future." But neither of these arguments are supported by the record. The evidence presented at the termination hearing establishes that Mother did not have stable housing and employment and that her employment and housing situations were uncertain, at best. Similarly, regardless of what Mother was able to do in the previous CINC cases, the undisputed evidence establishes that she failed to submit a single negative UA test throughout the current CINC proceedings—including on the day of the termination hearing. These facts are clear and convincing evidence that her use of dangerous drugs is unlikely to change in the foreseeable future. See *In re Price*, 7 Kan. App. 2d at 483. That conclusion is only strengthened when the future is considered within the context of "child time." See *In re L.B.*, 42 Kan. App. 2d at 842.

The district court also found that public and private agencies have been unable to rehabilitate the family and that Mother has failed to adjust her circumstances to meet the needs of the children. In support of her claim that she could adjust her circumstances to meet the needs of her children in the foreseeable future, Mother points to the fact that the children had been successfully reintegrated with her before so there is "no reason to believe that she could not be successful again in the foreseeable future." But again, this argument finds no support in the record. As noted above, Mother has failed to complete even the first step on many of the requirements for reintegration with her children. And even if she had, her continued use of illegal and dangerous drugs throughout the CINC proceedings provides strong evidence of her unwillingness to adjust her circumstances to meet the needs of her children.

In sum, when viewed within the context of "child time," we find clear and convincing evidence to support the district court's finding that the statutory factors rendering Mother an unfit parent were unlikely to change in the foreseeable future. See *In re L.B.*, 42 Kan. App. 2d at 842; *In re C.C.*, 29 Kan. App. 2d at 954.

2. *Best interests of the children*

A district court's best interests determination must be based upon a preponderance of the evidence and is soundly within the court's judicial discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). Appellate courts therefore review a best interests determination under the traditional abuse of discretion standard. 50 Kan. App. 2d at 1116. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court, (2) it is based on an error of law, or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). In this case, Mother does not argue that the district court's best interests determination was based on a mistake of fact or law. Instead, she claims no reasonable person would agree with the district court's decision because it is not supported by the evidence in the record.

When making a best interests determination, the district court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1). A panel of this court has interpreted this statutory mandate to require the court to

> "weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Mother claims that there was no evidence to show that the children's physical, mental, and emotional health would be served by the termination of her parental rights

11

and that, by contrast, the evidence presented at the termination hearing demonstrated that Mother loved her children and was bonded with them.

There was evidence presented at the termination hearing to establish that Mother loved and had a bond with her children. Ultimately, though, the district court found that this was insufficient to overcome the other factors at issue in the case. The court noted that the children had been living with their great-grandmother. She had taken care of the children for four of the last five years and was a viable permanency resource once rights were terminated. And during the entire time these CINC cases were pending, Mother was still struggling in all areas and appeared to be unable to provide stability in the foreseeable future.

Courts must evaluate parents by actions and not intentions; therefore, the district court may find it in the best interests of the children to terminate parental rights notwithstanding the fact that parents are bonded with and love their children. See *In re A.A.*, 38 Kan. App. 2d at 1105. While Mother has demonstrated she loves her children, she failed to make any progress while this CINC case was pending to stabilize her mental health, refrain from using drugs, or maintaining stable income and housing. A reasonable person could agree that the children's need for permanency and the harm that could be caused by its further delay outweighed the risk of detriment caused by severing the children's relationship with Mother. For this reason, we find the district court did not abuse its discretion in finding that terminating Mother's parental rights was in the children's best interests.

Affirmed.