NOT DESIGNATED FOR PUBLICATION

Nos. 119,045
119,046

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of L.K. and K.K.,
Minor Children.

MEMORANDUM OPINION

Appeal from Douglas District Court; ROBERT W. FAIRCHILD, judge. Opinion filed October 19, 2018. Affirmed.

*Joshua D. Seiden*, of Seiden Law Office, P.A., of Lawrence, for appellant natural mother.

*Lindsie Ford*, legal intern, *Kate Duncan Butler*, assistant district attorney, and *Charles Branson*, district attorney, for appellee.

Before BUSER, P.J., GREEN and ATCHESON, JJ.

PER CURIAM:  Mother appeals the district court's termination of her parental rights as to her children, L.K. and K.K. She contends the evidence presented at trial was insufficient to support the district court's finding that she was an unfit parent. Upon our review we find no error in the district court's judgment terminating Mother's parental rights. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother is the natural mother of L.K., born in 2002, and K.K., born in 2004. Father is the natural father of L.K. and K.K., however, he did not appeal the termination of his parental rights. As a result, this appeal only relates to the termination of Mother's parental rights.

1

L.K. and K.K. were initially placed in the custody of the Department of Children and Families (DCF) on January 29, 2013. On January 23, 2013, K.K. found Mother on the kitchen floor, unconscious and bleeding from self-inflicted cuts to both wrists. The police were notified. Mother claimed that her actions were the result of excessive drinking and not mental health issues. She did acknowledge, however, having a history of depression and that she was a recovering "cutter."

A temporary custody hearing was held in January 2013 in Douglas County District Court. At the conclusion of the hearing, L.K. and K.K. were ordered to remain in DCF custody and placed in foster care. A case plan was prepared with the goal of reintegrating Mother with L.K. and K.K. In the case plan, Mother was assigned specific tasks primarily designed to address her serious substance abuse and mental health issues. Those tasks included individual and family therapy, psychological and parenting evaluations, random drug and alcohol testing, and visits with social workers.

The children were adjudicated to be children in need of care (CINC) at a hearing in February 2014. The goal of the case plan continued to be reintegration until a permanency hearing was held in October 2014. At that hearing, the district court found that Mother had failed to make adequate progress on her case plan goals. Specifically, the district court found that Mother was consuming alcohol again, had failed to sufficiently attend individual therapy to address her serious mental health issues, had unstable housing, and continued having relationship problems with her boyfriend, J.D.H. As a result, the district court revised the goal of the case plan from reintegration to adoption, noting that L.K. and K.K. "have been out of the home almost two years without significant progress" made by Mother.

In November 2014, the State filed a motion to terminate Mother's parental rights. In support of the motion, the State highlighted the number of incidents where Mother was drunk, her inconsistent participation in individual therapy, her volatile relationship with

J.D.H., and unstable living situation. A trial on the State's motion to terminate parental rights was set for July 2015.

In June 2015, however, the State filed a motion to continue the termination hearing because Mother had made significant progress during the preceding months. This suggested that "reintegration may still be a viable option." The catalyst for that progress, which included Mother's increased stability and willingness to complete case plan tasks, was the placement of L.K. and K.K. with their older sister, A.J., and her partner, D.H. In fact, Mother made so much progress in the summer and fall of 2015 that reintegration was recommended and approved in December 2015. Under the latest plan, L.K. and K.K. were permitted to reside with Mother provided they all continued living in the home of A.J. and D.H. The expectation was that parenting responsibilities would be shared between Mother, A.J., and D.H., and "[t]hree individuals were going to be able to contribute to the stability of housing and the financial stability, as well."

Upon reintegration, Amber Seater, an aftercare therapist, was assigned to work with the family. Seater was tasked with establishing a case plan for the family to complete. That case plan required Mother to undergo individual therapy and mental health treatment regarding her previously diagnosed borderline personality disorder, a chronic condition that causes Mother's functionality to fluctuate due to current and past trauma as well as the stresses of everyday life.

Shortly after reintegration, Seater reported numerous instances wherein she had difficulty making contact with Mother. Mother was unprepared for many of Seater's visits and admitted to forgetting about them on many occasions. In addition, after the reintegration, L.K. began "acting out," both at home and at school. Much of this, Mother acknowledged, was a result of her failure to discipline L.K. In particular, Mother allowed L.K. to stay up all night playing video games and then did not wake him up to attend school in the mornings. Importantly, Mother also initially refused to take L.K. to his

3

individual therapy appointments and consistently refused to allow L.K. to take medication, despite the recommendations of many therapists.

Partly due to conflicts over L.K., in March 2016, Mother and her children moved back to J.D.H.'s home. Notably, Mother did not have permission from DCF to move back in with J.D.H. Instead, Mother informed DCF of the move as it occurred. Despite the unauthorized move, DCF assisted in the transfer of L.K. and K.K. to a new school district, and the arrangement of new aftercare services.

The family's reintegration faltered under the latest living arrangement. Mother delayed scheduling therapy appointments for L.K. and eventually stopped communicating with the therapist. L.K. and K.K. were also repeatedly left alone together in violation of the agreed upon safety plan. Additionally, Mother continued to refuse to engage in individual therapy to address her borderline personality disorder.

Five months after reintegration with Mother, DCF removed the children from Mother's care, citing L.K.'s significant behavioral issues and the total lack of cooperation from Mother. Six months later, in September 2016, the State renewed its motion to terminate parental rights.

In May 2017, a three-day trial on the motion to terminate parental rights was held. At the conclusion of the trial, the district court filed a very thorough written order which detailed its factual findings and conclusions of law. The district court found Mother to be unfit and terminated her parental rights. In particular, the district court noted that Mother was presumed unfit under K.S.A. 2016 Supp. 38-2271(a)(6) because the children had been in out of home placement for two years or longer. The district court held that Mother did not meet her burden to rebut this presumption.

4

As discussed in the analysis section of this opinion, the district court also relied on three statutory factors to determine Mother's parental unfitness. Additionally, the district court concluded that Mother's conduct or condition was unlikely to change in the foreseeable future and that it was in the best interests of the children to terminate Mother's parental rights. Mother timely appeals.

ANALYSIS

On appeal, Mother raises one issue: "The evidence presented was insufficient to support the court's finding of unfitness as to appellant mother." The State counters by arguing that the district court's ruling was properly supported by clear and convincing evidence that Mother's conduct or condition rendered her unfit, and it was unlikely to change in the foreseeable future. The State also argues that the district court properly considered the children's best interests when it terminated Mother's parental rights.

We begin the analysis with a brief summary of the standards of review to be applied by district courts and appellate courts in these matters. Before terminating parental rights, the district court must find that the State proved by clear and convincing evidence that the parent is unfit and the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). The district court must also find, by a preponderance of evidence, that termination of parental rights is in the best interests of the child. K.S.A. 2017 Supp. 38-2269 (g)(1).

In reviewing a district court's decision terminating parental rights, an appellate court must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated]." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing evidence is an "intermediate standard of proof between a preponderance of

5

the evidence and beyond a reasonable doubt." 286 Kan. at 691. Appellate courts do not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

*Parental Unfitness*

A district court evaluates whether a parent is unfit by considering a nonexclusive list of factors set forth in K.S.A. 2017 Supp. 38-2269(b) and (c). Any one of the factors standing alone may—but does not necessarily—provide sufficient grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

In this case, the district court noted that Mother was presumed to be unfit under K.S.A. 2016 Supp. 38-2271(a)(6) because the children had been in out of home placement for two years or longer. The district court held that Mother did not meet her burden to rebut this presumption. On appeal, Mother does not contest the applicability of this presumption or argue that she rebutted it. An issue not briefed by an appellant is deemed waived or abandoned. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Instead, Mother challenges the sufficiency of evidence related to the following three statutory factors cited by the district court in support of its legal conclusion that Mother was unfit:

1. Mother physically, mentally, and emotionally neglected the children. K.S.A. 2017 Supp. 38-2269(b)(4);
2. Mother demonstrated a lack of effort to adjust her individual circumstances, conduct, or conditions to meet the needs of the children. K.S.A. 2017 Supp. 38-2269(b)(8); and
3. Mother failed to carry out a reasonable case plan approved by the court directed toward the integration of the children back into her home. K.S.A. 2017 Supp. 38-2269(c)(3).

We will consider whether the district court's findings on one or more of these three factors are supported by clear and convincing evidence.

1. *Mother physically, mentally, and emotionally neglected the children.*

L.K. and K.K. were initially taken into DCF custody and placed in foster care after Mother was found by L.K. unconscious and bleeding from self-inflicted cuts to her wrists. At the time, Mother acknowledged abusing alcohol with a history of depression and suicidal tendencies.

More than two years later, the children were reintegrated with Mother while living with their older sister and her partner. Even with this added support, however, Mother was still unable to provide the proper level of parental care. She failed to assure that L.K. had sufficient sleep and regularly attended school. Mother also failed to discipline or control L.K.'s behavior when he began to act out both at school and at home. Moreover, Mother demonstrated a reluctance to afford L.K. with therapy to address his behavioral problems or to allow him to take medication as recommended by many therapists.

L.K.'s behavioral issues quickly resulted in a conflict between Mother and A.J. Instead of resolving the issues relating to lack of discipline, however, Mother opted to remove the children from A.J.'s home and take them back to the residence of her longtime boyfriend, J.D.H. Not only was this in violation of the reintegration plan, but it also required L.K. and K.K. to change schools and relocate their aftercare services.

Shortly after this latest move, the children were again taken into DCF custody, primarily because of L.K.'s significant behavioral issues and Mother's apparent inability to handle them. Even after losing custody of her children for a second time, Mother continued to demonstrate an inability to provide them with physical and emotional care. This was most clearly demonstrated during visitations when Mother insisted on

7

discussing the case with the children despite repeated warnings to avoid these discussions. As a direct result of her actions, Mother's visits with the children were changed from monitored to fully supervised.

2. *Mother demonstrated a lack of effort to adjust her individual circumstances, conduct, or conditions to meet the needs of the children.*

Mother was diagnosed with post-traumatic stress disorder and borderline personality disorder. In light of those mental health concerns, all of the case plans emphasized treatment, including individual therapy for Mother. The individual therapy was particularly important because Mother's borderline personality disorder ordinarily requires extensive and continuous therapy to treat and manage the condition.

Despite receiving numerous reminders that she must undergo individual therapy in order to reintegrate with her children, Mother refused the requests. Significantly, during the almost five years the children were in DCF custody, Mother only attended seven individual therapy sessions. Although on appeal she claims the refusals were the result of her inability to find an appropriate therapist, the record shows that Mother said on numerous occasions that she was unwilling to engage in individual therapy because it was ineffective and of no benefit to her.

Mother also failed to provide the children with a stable living situation. She continued to pursue her relationship with J.D.H. while not addressing the longstanding problems inherent in that relationship. For example, Mother and J.D.H. never participated in couple's counseling as recommended. Mother then placed the children in that unstable environment when they moved in with J.D.H. That residential move required the children to change schools and otherwise adjust, once again, to a new living environment.

Within a few months of this move, the children were placed once again in DCF custody. One reason for this change was L.K.'s defiant and verbally aggressive behavior in school and in the home. K.K. confided to a therapist that she did not feel safe in the home because she did not believe that L.K.'s behavior was controllable by adults. Still, after losing custody of her children for a second time, Mother continued to be uncooperative towards professionals who were attempting to help her and the children. Of note, Mother refused to even meet with DCF workers in the months preceding the termination hearing.

3. *Mother failed to carry out a reasonable case plan approved by the court directed toward the integration of the children back into her home.*

In addition to constituting a failure to adjust her individual circumstances, conduct, or conditions to meet the needs of the children, Mother's failure to engage in individual therapy also constituted a failure to carry out a reasonable case plan directed towards reintegration. Significantly, as of July 2016 Mother was not taking medication or attending individual therapy. Moreover, Mother testified that she would not take the medication if it was prescribed. Because individual therapy was a prerequisite for family therapy, Mother's failure to participate in individual therapy prevented her from completing family therapy, another important aspect of her case plan that was imperative for reintegration.

Upon our review of all the evidence in support of the statutory factors discussed earlier, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that Mother's parental rights should be terminated because she was unfit as a parent. See *In re B.D.-Y.*, 286 Kan. at 705.

9

*Conduct or Condition Unlikely to Change in the Foreseeable Future*

Although not specifically raised on appeal by Mother, we next consider whether there is clear and convincing evidence to support the district court's finding that the conduct or condition which rendered Mother unfit is unlikely to change in the foreseeable future. A court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). Moreover, "[a] parent's actions, not intentions, are the measure to be used in determining likelihood of change in the foreseeable future." *In re M.H.*, No. 117,127, 2017 WL 5951684, at *4 (Kan. App. 2017) (unpublished opinion), *rev. denied* 307 Kan. 987 (2018).

In this regard, it is important to emphasize that children experience the passage of time differently than adults. K.S.A. 2017 Supp. 38-2201(b)(4). The test is not whether Mother was making positive steps towards accomplishing the goals set forth in her case plans, but whether she has the ability to actually accomplish—in the foreseeable future—the tasks necessary for reunification.

In this case, the district court found the conduct or condition that led to a finding of unfitness was "not likely to change in the foreseeable future." In particular, the district court determined: "The Mother's emotional illness, mental illness or mental deficiency, is of such duration or nature as to render her unable to care for the ongoing physical, mental and emotional needs of the children." In this regard, the district court noted: "Mother's mental illness is one of the primary reasons why [the] Children were taken into DCF custody and Mother has failed to comply with court orders and case plan[] tasks requiring her to participate in individual therapy." The district court also observed that the "reasonable efforts of DCF, KVC, and other community agencies have failed to rehabilitate the family."

Additionally, the district court expressed concern regarding the lengthy period of time the children were in out of home placements. L.K. was 12 years old and K.K. was 10 years old when they were removed from Mother's care in January 2013. They have, therefore, spent about one third of their lives living in out-of-home placements, and in that time Mother demonstrated little willingness to change her conduct or circumstances. Although Mother, at times, made some progress in dealing with her issues, the evidence revealed that Mother could not make the necessary life changes to properly care for her children.

Upon our review, we conclude there exists clear and convincing evidence in the record to support the district court's finding that the conduct or condition which rendered Mother unfit is unlikely to change in the foreseeable future.

*Best Interests of the Children*

Finally, for the sake of completeness, we next consider whether there is a preponderance of the evidence to support the district court's finding that termination of parental rights is in L.K. and K.K.'s best interests. K.S.A. 2017 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). In making this determination, the district court gives primary consideration to the physical, mental, and emotional needs of the children. K.S.A. 2017 Supp. 38-2269(g)(1). As we have stated:

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

11

We review a district court's decision regarding the best interests of children for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1116. An abuse of discretion occurs when no reasonable person would agree with the district court or if the court bases its decision on an error of fact or law. 50 Kan. App. 2d 1105, Syl. ¶ 2.

In this case, the district court found that it was in the children's best interests to terminate Mother's parental rights because the "[c]hildren's physical, mental, and emotional health would be best served by termination of parental rights." Mother fails to specifically refute this finding, and the record is replete with examples of how Mother's actions and inactions have resulted in significant problems for both L.K. and K.K.

Mother has failed to show the district court abused its discretion by finding it was in the best interests of L.K. and K.K. to terminate her parental rights. It is an understatement to observe, as the district court did in its order, that L.K. and K.K. needed "a stable environment in which to thrive." We conclude a reasonable person could agree with the district court that it was in L.K. and K.K.'s best interests to terminate Mother's parental rights.

Affirmed.