NOT DESIGNATED FOR PUBLICATION

No. 124,374

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of S.C., S.C., and H.C.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District Court; ERICA K. SCHOENIG, judge. Opinion filed July 8, 2022. Affirmed.

*Dennis J. Stanchik*, of Shawnee, for appellant natural mother.

*Elizabeth A. Billinger*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., WARNER and CLINE, JJ.

PER CURIAM:  Mother appeals the district court's order finding her unfit as a parent and finding that it was in the best interests of her three children to terminate her parental rights. Finding no error, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Mother and Father are the parents of three children. Although Father's parental rights were also terminated, he did not appeal that decision. But because the parties ultimately agreed to a joint reintegration plan, his involvement is mentioned only to give context to the allegations by the State and the findings by the district court. Mother and Father remained married and together throughout this case.

1

On November 26, 2019, the State filed child in need of care (CINC) petitions regarding Mother and Father's three children, H.C., who was 14; S.C.-1, who was 11; and S.C.-2, who was 7 (children). The following day, the district court found an emergency existed and placed the children in Department of Children and Families (DCF) custody. This was based on allegations of physical abuse of the children as well as drug use by both parents, with Mother testing positive for methamphetamine. A guardian ad litem was appointed for the children.

In January 2020, both Mother and Father entered no-contest statements regarding the allegation that children were without the care or control necessary for their physical, mental, or emotional health under K.S.A. 2020 Supp. 38-2202(d)(2), which the district court accepted. The district court also accepted the facts as outlined in the State's petition.

Those facts outlined a sordid history of reports to the DCF regarding the children. Two years before the current petition was filed, DCF received a report alleging physical neglect, by Mother and Father. The report alleged that the family was squatting in a home. The utilities were turned off and it was said the home was in a hoarding like condition with dog feces. The home condition posed health and safety hazards and the family was living in one room of the home with a charcoal heater in sub-zero weather. Police were called and the family sent the children to stay with a friend or family member and agreed to participate in family preservation services. The family completed services while living in Salvation Army housing most of the time.

Nine months before the State filed the current petition, H.C. was reported to the Johnson County District Attorney's Office as truant on numerous occasions from middle school. Just a couple months later, DCF received reports of sexual abuse, emotional abuse, and physical neglect. It was alleged that on multiple occasions both Mother and Father would go into the children's room at night and touch them. The report also alleged that Father would provide alcohol and marijuana to H.C., so she could get drunk and high

2

in a shed behind their house. The same report alleged that the children were not being properly fed, all appearing underweight and thin for their ages. They were also dirty and unkept. Neither parent responded to multiple attempts at contact in person at their reported home, by letter, or by phone call.

A month later another report came into to DCF, again for physical and sexual abuse. The report alleged H.C. had suspicious bruising on her face. She stated they were hickeys that a friend gave her while staying at his home as a joke. It was also noted that the children continued to be dirty and unkept. And again, neither parent responded to attempts at contact in person at their reported home, by letter, or by phone call.

Approximately two weeks before the petition was filed, DCF received a report regarding physical abuse. The report alleged that S.C.-2 had a black eye from her dog biting her. The report stated that when S.C.-2 entered her classroom, she would immediately tell her teacher about any marks or bruising on her body without being questioned. Further, the report alleged it was the third time she has shown up at school with a black eye. S.C.-2 also stated that her family had recently been staying in a home that Father was painting but had to leave due to the owner's return. When S.C.-1 was interviewed, she cried and stated they were currently staying at a friend's house after leaving a homeless shelter. She also stated, "'We lost the house because my dad didn't pay a bill in Gardner'" and that the Salvation Army was assisting them with finding a home. S.C.-1 stated that Father works as a painter and fixes houses and Mother did not have a job due to the lack of transportation.

Another report came in approximately one week before the current petition was filed, again for physical abuse. The report alleged that Mother had used electrical tape to tie up S.C.-2., although S.C.-2 stated that it was for fun and just a joke. Over the next week, DCF workers made no less than ten attempts to contact Mother and Father by phone and text. DCF workers also searched two different hotels where the family was

3

reported to be staying. They were finally able to reach Mother a few days before the petition was filed. Mother denied all allegations of abuse and stated they were currently staying in a hotel and working with the Salvation Army to obtain a more permanent home. Mother was unwilling to give the location or name of the hotel where they are staying. Mother also stated H.C. was self-harming and was admitted to Marillac. She also advised that H.C. had been residing with her boyfriend but did not give his name. Amy Hanson, a DCF case worker, requested a meeting with Mother and informed her that she would call her back with more information on the date and time. Hanson attempted to reach Mother to inform her of the meeting. She left a voicemail and text but did not receive a reply.

At the CINC hearing, the district court found clear and convincing evidence that the children were in need of care and adjudicated them as such, based not only on the grounds that were uncontested (children were without the care or control necessary for their physical, mental, or emotional health under K.S.A. 2020 Supp. 38-2202[d][2]), but also that there was clear and convincing evidence that the children were in need of care under K.S.A. 2020 Supp. 38-2202(d)(1) (children were without adequate parental care, control, or subsistence and it is not due solely to the lack of financial means of the children's parents or other custodian), and K.S.A. 2020 Supp. 38-2202(d)(3) (children have been physically, mentally, or emotionally abused or neglected or sexually abused).

The district court also concluded the goal should be reintegration and offered Mother and Father a six-month joint reintegration plan.

The reintegration plan, which went into effect in January 2020, was broken down into four sections and was originally scheduled to run for six months. Julius Ellis, a case manager employed by Kaw Valley Center (KVC) was assigned to the case in March 2020. He had several case plan task meetings with Mother and explained each of the sections and tasks assigned.

4

The first section of the reintegration plan concerned the home environment. To accomplish the goals under this section, Mother needed to provide Ellis with a lease and demonstrate she had stable housing. Assuming appropriate progress with other tasks, Mother accomplishing this goal would have allowed Ellis to perform a walkthrough of a residence to ensure its safety and appropriateness for the children.

The second section of the reintegration plan concerned Mother's psychological and physical needs. This section required Mother to engage in substance abuse treatment and complete random urinalysis tests. Ellis testified he explained the urinalysis testing process, as well as the fact that missed tests were considered positive tests. He also said Mother seemed to understand the process.

The third section of the reintegration plan concerned visitation with children. Visitations were to take place on a weekly basis. Ideally, visitation begins with supervised visits at KVC and progresses to longer visits before unsupervised visits.

The final section of the reintegration plan concerned general tasks Mother had been asked to complete. Those tasks included signing necessary releases, providing KVC with any law enforcement interaction within 48 hours, abide by safety plans, explore financial education programs, submit monthly budgets to KVC, and provide proof of a driver's license or other transportation and accompanying documentation. Again, Ellis said Mother understood these tasks.

During this entire case, the children remained together in foster care in Crawford County.

In November 2020, the State filed a motion for a finding of unfitness and termination of both Mother's and Father's parental rights concerning the children.

5

In July 2021, now 18 months since the children were removed from the home, the district court held a combined termination hearing concerning the children. Father did not appear. Ellis and Mother were the only two witnesses at the hearing.

The undisputed testimony as it relates to each of the four reintegration plan sections was as follows.

I.      MOTHER FAILED TO OBTAIN STABLE HOUSING

The family's housing history was chaotic, to say the least. At the beginning of the case, the family lived in a hotel because Mother no longer wanted the children to be around the place they lived prior to the hotel. While living at the hotel, the children were removed from the home. Mother and Father subsequently moved to a trailer in Gardner and lived there for approximately nine months until the trailer's owner sold it. Mother said she reported the trailer's address to KVC. Mother also claimed the case manager before Ellis planned to do a walkthrough of the trailer but quit the week before doing so. However, Ellis started on the case in March 2020, just three months after the children were removed from the home.

After the trailer, Mother said she and Father moved in with a friend in Gardner, where the two lived for another eight or nine months. After that, they moved in with another friend, whom they still lived with at the time of the termination hearing. Mother said she intended to live with that friend until she and Father could attend inpatient drug treatment. Once they completed that, Mother planned to get a different place.

Mother said she never asked a KVC worker to do a walkthrough of subsequent homes because she did not know she was supposed to, and she and Father were still looking for a place of their own.

Mother told Ellis during their April 29, 2021 meeting that she still did not have stable housing. Instead, she was living at a friend's house in Olathe. Ellis never visited that home because he knew Mother did not own or rent it. He also never received any sort of communication from Mother saying she planned to reintegrate the children in that home. Mother further advised him she had not been working on getting stable housing because she was doing inpatient treatment. Ellis knew Mother completed an intake with the treatment facility in January, but she never did the follow-up appointment. When Ellis asked Mother about this, she told him she planned to go on June 14 or 15, 2021, but he did not know what happened on those dates.

In sum, Mother never provided Ellis with a copy of a lease to indicate stable housing. Ellis knew Mother had been living in various places throughout the case. Nor had she provided him with proof of any change of address within 72 hours as required. Moreover, Mother confirmed she did not have a permanent place for the children to reintegrate, but she also believed KVC did not think it would be appropriate for the children to reintegrate to a home with her and Father based on the progress of their visits.

II.     MOTHER FAILED TO ADDRESS HER OWN PSYCHOLOGICAL AND PHYSICAL NEEDS

Mother admitted to using methamphetamine two days prior to the children being removed and testing positive the day of removal. Since the children were removed, Mother did not know how often she used methamphetamine but denied using it often. Similarly, she did not know how many positive urinalysis tests she had throughout the case, but she admitted she had not completed drug treatment, missed numerous urinalysis tests, and tested positive on multiple occasions.

Mother struggled with the urinalysis tests, missing somewhere between 60-70 tests between January 2020 and June 2021. The few times she did submit to testing, her results were mixed between positive (3) and negative tests (13). These tests did not cost her

7

anything. She did not dispute this fact. When asked why she missed, Mother said she sometimes forgot to call, or bad weather prevented her from going, or she did not have phone service due to failure to pay the bill. She also said that only Father drove, and there were times when he got off work too late to be able to go because they only had one vehicle. She attributed her last positive test in October 2020 to medication she received in the hospital for a kidney infection, but she did not submit any proof to verify that theory.

Mother completed several drug and alcohol evaluations, but she failed to comply with the recommended inpatient treatment. Ellis assisted Mother in efforts to obtain treatment by contacting a treatment center for Mother multiple times. Ellis also said the substance abuse supervisor had communicated with the treatment center by e-mail. The supervisor then forwarded those conversations to Ellis, who relayed the information to Mother during their weekly meetings. Despite this, Mother did not follow through with the substance abuse treatment recommendations. Several alcohol evaluations were required throughout the course of the case because, according to Ellis, each time when she failed to follow through, new evaluations were needed by the time she reengaged. Mother claims she was simply waiting for the program she had been accepted into to tell her they had a bed available for her. There was no evidence that she had looked into other available programs to get her treatment completed earlier in the case so she could reintegrate with the children.

Mother said she occasionally attended Narcotics Anonymous classes online and another online program, but she could not recall the name of it.

Part of the purpose of family therapy was to help Mother understand the type of environment she needed to create in the home, and the environment needed to be drug-free. Both Ellis and the family therapist, who also recommended inpatient drug treatment for Mother, stressed the importance of sobriety to Mother. And even though Mother had not submitted a positive urinalysis test since October 13, 2020, the drug treatment center

8

had completed a drug and alcohol evaluation in the meantime and continued to recommend inpatient drug treatment.

III.    VISITATION FAILED TO PROGRESS DUE TO MOTHER'S FAILURE TO COMPLETE TREATMENT

Mother did well with visitation, and the family got along with each other. Visitations took place on a weekly basis, which Mother regularly attended. During visits, Mother would bring toys for the children to play with and would sometimes prepare food. Ellis believed the children looked forward to the visits, and he believed the visits were successful. After the visits, the children would return to their placement. H.C. would exhibit some mood changes upon returning from visits.

Mother wished the visits would have been extended, but she understood the visits would not be extended unless she attended inpatient treatment. That said, she clearly understood that this case failed to move beyond supervised visitation at KVC due to a lack of progress on other reintegration plan tasks. Mother testified she knew she needed to complete inpatient drug treatment before the visits with the children would change. The lack of progress on case plan tasks, paired with the ongoing concern about Mother's drug us—that she failed to dispel—placed her needs above those of the children.

And Ellis testified that even if supervised visits were no longer necessary, the family would progress to monitored visits, unsupervised visits, and overnight visits before the children could be returned to Mother. None of this can happen until Mother completes drug treatment. Yet she testified, "Yes, I understand [I] shouldn't do drugs. I mean, I get all of that. But my children should not have to pay the price" by being removed from their parent's home.

9

IV.     MOTHER FAILED TO COMPLETE OTHER GENERAL TASKS

The final section of the reintegration plan concerned general tasks Mother had been asked to complete. Those tasks included signing necessary releases, providing KVC with any law enforcement interaction within 48 hours, abide by safety plans, explore financial education programs, submit monthly budgets to KVC, and provide proof of a driver's license, registration, and insurance or other transportation and accompanying documentation. Again, Ellis said Mother understood these tasks, but she failed to complete them.

Mother followed court orders and did not have any negative interaction with law enforcement. But part of the case plan tasks required Mother to submit proof of completed background checks of anyone she lived with who was older than 10 years old, and Mother had never provided Ellis with any such documentation. Father also had an outstanding warrant at the time of the termination hearing, which concerned Ellis because Mother and Father lived together, and Father could be arrested at any time.

Additionally, Mother completed a 10-week parenting program and saw a family therapist. Mother continued to see the family therapist at the time of the termination hearing. She claimed she asked for additional therapy sessions, but KVC refused to give them to her.

Mother did not have a safety plan to follow, so this task was not required.

Mother did not engage in financial education programs. Mother told Ellis that because she did not have a job or any source of income, financial education was not necessary. It is true that neither parent had been working for a few months, which meant the family had no source of income. How this negated the need for a financial education program was never explained. During their April 29, 2021 meeting, Mother told Ellis that

10

she had been searching for employment but stopped to attend inpatient treatment, which she still had not begun.

Additionally, Ellis had not received any documentation pertaining to Mother's driver's license, proof of car registration, or insurance. Despite this, Ellis knew Mother and Father had a vehicle, which Father drove to the visits. Mother admitted that she did not have a driver's license due to a missed court date several years earlier and that Father's license was suspended. She acknowledged that neither of them had provided KVC proof of registration or insurance on their vehicle. Despite this, they drove to visitation and Father drives a car to work.

According to Ellis, although Mother was aware of medical appointments she did not attend. Mother disagreed. She expressed dissatisfaction with the lack of communication between her and the foster family. She stated that she often had to learn about things like grades and medical appointments from the children instead of from the foster family, which upset her. Based on this lack of communication, Mother felt she lacked knowledge about the children's lives.

V. THE BEST INTERESTS OF THE CHILDREN

Ellis then testified about the children. He said they were in a placement with a foster family in Crawford County. Based on his conversations with the children and the foster family, Ellis believed it would be in the children's best interests to terminate Mother's parental rights. He believed this because the children were at a stage in their lives where they needed permanency, and he thought the foster family could provide stability. H.C. had gone from being truant and making D's and F's to making straight A's in school. While in Mother's care, H.C. was truant, struggling with drug use, and flunking middle school. Mother admitted that she had no stable housing and had not progressed to

11

increased visitation, so reintegration would not be possible or advisable at the time of the hearing.

Following closing arguments in the termination of parental rights hearing, the district court took a brief recess to review the evidence before making its ruling. After doing so, the district court concluded there was clear and convincing evidence to make a finding of unfitness under K.S.A. 2020 Supp. 38-2269(a) that supported the termination of Mother's parental rights. In so finding, the district court found there was clear and convincing evidence under K.S.A. 2020 Supp. 38-2269(b)(3) to support its determination of unfitness. The court stated:

> "Mother doesn't dispute in her testimony today that she has struggled with methamphetamine use. The Court finds she's . . . minimizing it during her testimony. She acknowledged that she had done methamphetamine with [F]ather a few times, but characterized the situation as [F]ather having the main methamphetamine issue, including . . . usage at work or sometimes on the way home from work.
> . . . .
> "Methamphetamines are very—it's a very dangerous drug. I think everyone would agree with that, and it's a serious drug. And [Mother] has failed to be engaged in her substance abuse treatment or really, to make any progress in that regarding during the pendency of this case, and that's . . . to the children's detriment, of course."

The district court also concluded there was clear and convincing evidence to support Mother's unfitness under K.S.A. 2020 Supp. 38-2269(b)(7) because KVC made reasonable efforts to rehabilitate the family. The district court specifically noted the efforts made by Ellis to arrange drug treatment options for Mother and encourage her to participate, to no avail. Similarly, the district court found that Mother failed to adjust her conduct or conditions to meet the need of the children, despite KVC going "above and beyond in this case to assist the parents and try to encourage them and help them complete their reintegration plan." The district court believed that Mother continued to

12

blame others for her lack of progress in the case. As a result, the district court found that clear and convincing evidence under K.S.A. 2020 Supp. 38-2269(b)(8) also supported terminating Mother's parental rights.

Additionally, the district court concluded, since the children were not in the physical custody of the parent, the court can also consider the factors under K.S.A. 2020 Supp. 38-2269(c)(1) and (c)(3). Under K.S.A. 2020 Supp. 38-2269(c)(1), the district court found that Mother could provide the basic needs for the children—such as housing, legal transportation, and having income—but she failed to do so. Under K.S.A. 2020 Supp. 38-2269(c)(3), the district court found that Mother had failed to accomplish many of the goals in the reintegration plan. As such, the district court concluded Mother was presently unfit and her unfitness would not change in the foreseeable future. And lastly, the district court concluded it was in the children's best interests to terminate Mother's parental rights.

Mother timely appeals. After Mother did so, the district court ordered the cases to be consolidated for appeal.

LEGAL ANALYSIS

I.    CLEAR AND CONVINCING EVIDENCE SUPPORTS THE DISTRICT COURT'S FINDINGS THAT MOTHER WAS UNFIT

On appeal, Mother argues the district court erred when it terminated her parental rights, asserting there was insufficient evidence to support the district court's decision.

When reviewing a finding of parental unfitness, this court must determine, after reviewing all the evidence in a light most favorable to the State, whether a rational fact-finder could have found the determination to be highly probable, i.e., by clear and

13

convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008); *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

Under K.S.A. 2020 Supp. 38-2269(a), the State must prove a parent "is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The statute provides district courts with a nonexclusive list of nine factors to consider when determining unfitness. K.S.A. 2020 Supp. 38-2269(b). Clear and convincing evidence of a single statutory factor under K.S.A. 2020 Supp. 38-2269(b) can be a sufficient basis for a district court's determination that a parent is unfit. K.S.A. 2020 Supp. 38-2269(f).

Here, the district court found that the evidence supported its findings of unfitness and the termination of Mother's parental rights was in the best interests of the children under K.S.A. 2020 Supp. 38-2269(b)(3), (b)(7), (b)(8), (c)(1), and (c)(3). Even though clear and convincing evidence of just one of these factors is sufficient to terminate parental rights, we will examine each.

A. *Use of intoxicating liquors or narcotic or dangerous drugs*

A district court may terminate a parent's rights to his or her child if there is clear and convincing evidence that "the use of intoxicating liquors or narcotic or dangerous drugs such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 2020 Supp. 38-2269(b)(3).

Mother concedes there is "clear and convincing evidence that the social agency in charge of [her] reintegration efforts had concerns about [her] use of methamphetamines," that she "tested positive for methamphetamines on the day of the temporary custody

14

hearing," that she "tested positive for methamphetamine on August 11, 2020," and that she "failed to provide UA samples on at least 50 occasions during the course of the case." But Mother does not believe this evidence supports termination. Instead, Mother frames the inquiry as: "[D]oes this evidence establish clearly and convincingly that [her] methamphetamine problem rendered her unable to care for the ongoing physical, mental or emotional needs of her children?"

We agree with Mother that use of drugs alone is not enough to terminate one's parental rights.

> "'Just because parents use drugs, or have been convicted of using drugs, or drink too much alcohol, does not automatically mean the child is likely to sustain harm, or the home is contrary to the child's welfare. If that were the test, then thousands of children would be removed from the home weekly.'" *In re L.C.W.*, 42 Kan. App. 2d 293, 301, 211 P.3d 829 (2009).

In *L.C.W.*, our court held that the State had failed to prove a connection between the parents' alleged (not proven) drug use and the child's welfare. "'The only evidence was that the child is healthy, was not left alone, and was not abused physically, mentally, or emotionally.'" 42 Kan. App. 2d at 301. That said,

> "[t]he State is not required to provide direct evidence that a parent's conduct is due to drug use if sufficient evidence shows that drug use impeded reintegration. Similarly, the State need not provide direct evidence that a parent's drug use is in and of itself harmful to a child where clear and convincing evidence shows that the parent's failure to acknowledge his drug issues creates a significant impediment towards reintegration. [Citations omitted.]" *In re M.S.*, 56 Kan. App. 2d 1247, 1258-59, 447 P.3d 994 (2019).

Such is the case here. This case does not involve isolated incidents of drug use that have left the children otherwise unaffected. As Mother testified, she used methamphetamine two days prior to the children being removed and tested positive for

15

methamphetamine the day of removal. Father, with whom she is still married and residing, also uses methamphetamine. As the district court noted:

> "Methamphetamines are very—it's a very dangerous drug. I think everyone would agree with that, and it's a serious drug. And [Mother] has failed to be engaged in her substance abuse treatment or really, to make any progress in that regard during the pendency of this case, and that's . . . to the children's detriment, of course."

Based on Mother's actions and her decision not to do what was necessary to reintegrate with her children by taking UAs (to establish she is not using) and getting treatment (so that she will not regress), the district court could draw no other conclusion than she is continuing to use drugs and it is detrimental to her kids. When the children were in her care, Mother said H.C. did not attend school and struggled with drug use. Since being in placement, H.C. went from "not car[ing] about school at all and . . . pretty much ha[ving] D's . . . and F's . . . to straight A's."

Mother has been unable or unwilling to get a job, obtain stable housing, or see her kids who she says are her "everything." Even though she knows clean UAs and treatment stand in her way—probably to all three of those things—she refuses. Instead, Mother has engaged in a pattern of noncompliance with urinalysis testing since January 2020. Her lack of compliance in this area of the case has also hindered other aspects of the reintegration plan. Because she could not test clean, the visits with her children never moved past the supervised stage. And both Ellis and the guardian ad litem advocated for the children to be removed, in large part due to Mother's continuing drug use and inability or unwillingness to complete inpatient treatment. As such, the district court did not err by relying on K.S.A. 2020 Supp. 38-2269(b)(3) when terminating Mother's parental rights. Clear and convincing evidence supports its finding.

## B. *Reasonable efforts by public or private agency have failed*

Additionally, a district court may terminate a parent's rights to his or her child if there is clear and convincing evidence that the reasonable efforts made by public or private agencies to rehabilitate the family have failed. K.S.A. 2020 Supp. 38-2269(b)(7).

Mother contends "that the terms 'reasonable efforts' as used in K.S.A. 38-2269(b)(7) should be interpreted as requiring a rational connection between the services provided by the social service agency and the particular issues that the court and social service agency see as preventing or hindering reintegration." Again, Mother's argument concerns statutory interpretation, which is a question of law over which this court exercises unlimited review. See *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

Our court has previously stated that the reasonable efforts requirement means that the parent must be provided with an opportunity to succeed, but not without the parent exerting some effort. *In re M.S.*, 56 Kan. App. 2d at 1257.

On this point, the district court found that KVC had "done everything they can do for this family." The district court noted that Ellis had called the inpatient drug treatment facility multiple times to try and get Mother a spot in the program. Similarly, both Ellis and another KVC employee had reached out to Mother to explain the importance of inpatient treatment and tried and get her to participate. The district court also noted Ellis' regular communication with Mother about other aspects of the reintegration plan. And though Mother had maintained regular visitation with the children, she has failed to carry out other aspects of the reintegration plan. Mother fails to suggest what else KVC could have done for her to assist her in the key tasks of drug treatment, UAs, stable housing, transportation, and income.

17

There is nothing to suggest Ellis, or any other KVC employee, did anything but try to assist Mother with reintegration. Ellis met with Mother every week. Ellis testified he discussed each section of the reintegration plan with Mother, and he believed she understood everything he told her. He told her about the stable housing requirement and the need to provide leasing information so KVC could perform a walkthrough of any prospective residence. Even so, Mother never provided a lease or asked him to do a walkthrough of any of the residences where she stayed. The only time Mother claimed she asked for a walkthrough was to the case manager before Ellis, who quit before doing so.

Ellis also explained the need for Mother to engage in financial education programs and provide KVC with proof of a driver's license or other transportation and accompanying documentation. Ellis said Mother understood these tasks, but she failed to complete them.

Similarly, Ellis testified that Mother understood his explanation concerning the need for substance abuse treatment. Ellis said Mother completed multiple drug and alcohol evaluations but never completed inpatient treatment. Ellis also explained how the drug testing system worked, as well as the need to comply with urinalysis testing. This explanation included the fact that missed urinalysis tests were considered positive tests. Despite this, Mother consistently missed tests throughout the case, and the results of the tests when she appeared were mixed.

Despite the efforts made by KVC and Ellis, Mother failed to adequately progress through the reintegration plan because many of the problems that existed at the beginning of the case continued to exist at the time of the termination hearing. As such, the district court did not err by relying on K.S.A. 2020 Supp. 38-2269(b)(7) when terminating Mother's parental rights. Clear and convincing evidence supports its finding.

18

*C. Lack of effort on part of parent to adjust circumstances*

Moreover, a district court may terminate a parent's rights to his or her child if there is clear and convincing evidence there is a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 2020 Supp. 38-2269(b)(8).

On this point, the district court concluded:

"[C]lear and convincing evidence proves that there's been a lack of effort on the part of [Mother] to adjust her circumstances, conduct and conditions to meet the needs of her children. One of the attorney characterized that, essentially, [M]other's position is that this is everyone else's fault, and the Court finds that that's . . . a compelling argument, and the evidence supports that argument.

"The Court heard a lot today from [Mother] about how, you know, she couldn't do something because someone else had not either shown her or helped her of assisted her. KVC has . . . really gone above and beyond in this case to assist the parents and try to encourage them and help them complete their reintegration plan. Even after the State's motion was filed, that hasn't stopped on the part of KVC. As so, it's not everyone else's fault.

"[Mother] testified that . . . her children are her world, and the Court believes that. But she has just not put in the effort that's needed to reintegrate with her children, and . . . that's unfortunate."

From these findings, Mother argues "there is not evidence in the record on appeal that would establish the specific needs of the children that were not being met." Instead, she believes "the district court found [she] failed to adjust her attitude toward KVC and the KVC case managers and that this failure constituted a circumstance, conduct, or condition that prevented [her] from meeting the needs of her children."

19

Mother's argument concerning the failure to adjust her attitude seemingly implies the district court had an issue with how she conducted herself. That argument is not supported by the record, as there is no evidence the district court had a personal issue with Mother's conduct.

That said, there is evidence in the record to support the argument that she made some positive changes in her life. Mother regularly met with Ellis and the two spoke often. She also followed court orders, did not have any negative interaction with law enforcement, completed a 10-week parenting program, saw a family therapist, and completed multiple drug and alcohol evaluations. Additionally, Mother regularly attended visits with the children, which she thought went well but were too short. Like Ellis, Mother believed the children looked forward to her visits, and she brought food and toys for the children during visits.

But as explained above, Mother also failed to make progress with other aspects of the reintegration plan, including establishing stable housing, providing KVC with leasing information, engaging in financial planning, and providing KVC with proof of a driver's license or other information concerning the vehicle the family used. Most importantly, Mother never completed drug treatment and failed to consistently perform urinalysis testing—the crucial hurdles in the case. As Mother acknowledged in her testimony, she knew that without progress in these two areas, the case would not progress. We need not rehash the same information explained above concerning inpatient treatment and urinalysis testing, but Mother's inability to comply with these requirements kept the case in essentially the same place at the time of the termination hearing that it was at the beginning of the case. As such, the district court did not err by relying on K.S.A. 2020 Supp. 38-2269(b)(8) when terminating Mother's parental rights. Clear and convincing evidence supports its finding.

*D. Assuring care in the parental home*

A district court may also terminate a parent's rights to his or her child when the child is not in the parent's physical custody if there is clear and convincing evidence the parent failed "to assure care of the child in the parental home when able to do so." K.S.A. 2020 Supp. 38-2269(c)(1).

On this point, the district court found that Mother was "capable of providing the basic needs for the children, but has just not done it." The district court noted the lack of stable housing, lack of a job or income, lack of transportation, and the fact the children could not return home at the time of the termination hearing.

Mother disputes these conclusions, arguing the evidence establishes that KVC failed to conduct an inspection at any of her residences. But the record belies this claim, and this argument, standing alone, does not refute the district court's other conclusions concerning K.S.A. 2020 Supp. 38-2269(c)(1).

First, as explained above, Mother claimed the case manager before Ellis planned to do a walkthrough of the trailer, but the worker quit the week before doing so. Mother claims "that KVC never attempted to conduct an inspection of the home into which [she] and her husband moved after leaving the trailer home." But the record demonstrates that Ellis began serving as case manager in March 2020, which meant he had served in the position for approximately 16 months at the time of the termination hearing. During that span of time, Mother never provided Ellis with a lease or asked him to do a walkthrough of any of the residences where she stayed. And it makes little sense to blame KVC for not doing an inspection when Mother acknowledges that KVC would not know a given residence could be a reintegrative home unless she told them. She admitted at the hearing that the home she was living in was not the one to which she hoped to reintegrate the children.

21

Second, Mother devotes no argument to refuting the district court's other conclusions regarding K.S.A. 2020 Supp. 38-2269(c)(1). The record demonstrates that Mother had no job and never provided proof of any legal form of transportation. During her testimony, Mother acknowledged that she had not been working. Similarly, Mother said she lost her driver's license after missing a previous court date a couple years ago. Her only explanation for the lack of a driver's license was that she did not know what she needed to do to get it back. Additionally, the record demonstrates that nothing prevented Mother from rectifying these issues.

These facts support the district court's conclusion on this issue. As such, the district court did not err by relying on K.S.A. 2020 Supp. 38-2269(c)(1) when terminating Mother's parental rights. Clear and convincing evidence supports its finding.

### E.      *Failure to carry out a reasonable reintegration plan*

Finally, a district court may terminate a parent's rights to his or her child if the child is not in the parent's physical custody and there is clear and convincing evidence the parent failed "to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." K.S.A. 2020 Supp. 38-2269(c)(3).

As explained in the preceding sections, Mother failed to establish stable housing, failed to complete inpatient drug treatment, failed to consistently attend urinalysis testing, failed to engage in financial planning, and failed to provide KVC with proof of a driver's license or other information concerning the vehicle the family used. All these tasks were included in the reintegration plan, and Mother's failure in these areas hindered progress on other tasks, namely the ability to progress with visitation. The district court cited all these reasons when finding clear and convincing evidence supported termination of her parental rights under K.S.A. 2020 Supp. 38-2269(c)(3), and, for the reasons explained above, it did not err in doing so. Clear and convincing evidence supports its finding.

22

II.     CLEAR AND CONVINCING EVIDENCE SUPPORTS THE DISTRICT COURT'S FINDINGS THAT MOTHER'S UNFITNESS WAS UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE

In addition to determining whether a parent is presently unfit, a district court must also determine by clear and convincing evidence whether the conduct or condition is unlikely to change in the foreseeable future before it may terminate parental rights. K.S.A. 2020 Supp. 38-2269(a). When determining whether a parent's conduct is likely to change in the foreseeable future, the court considers the foreseeable future from the child's perspective because children experience time differently than adults. K.S.A. 2020 Supp. 38-2201(b)(4), *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). We may look to Mother's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P. 2d 467 (1982) ("Even if the State's evidence in this case might lack expert prognostic evidence, we are satisfied continued unfitness can be judicially predicted from a parent's past history without expert opinion testimony.").

Based on Mother's lack of progress on crucial aspects of the reintegration plan, the district court concluded she could not make the necessary changes in her life in the foreseeable future. Mother believes the district court erred in making such conclusion, given that she had stable housing, was prepared to begin inpatient treatment when a spot in the program became available, and had not tested positive for methamphetamine for a significant time prior to trial.

To recap, the State originally filed the CINC petitions in November 2019. The same month, the district court placed the children in DCF custody. The children have been in the State's custody ever since, meaning approximately 20 months had elapsed at the time of the termination hearing in July 2021.

23

Mother is correct that she had made some positive changes in her life throughout the case, as explained above. But, as also explained above, the record does not support the conclusion that Mother had stable housing. Contrary to the statement in her appellate brief, she testified she did not have a place for them to stay. And while she is correct that she had not tested positive for methamphetamine use for a while prior to the termination hearing, she overlooks the fact that each missed test is considered positive. To be fair, the extent to which Mother used methamphetamine is not clear from the record. But the lack of clarity derives from her inability to consistently submit to urinalysis testing, and it is illogical to credit Mother for not submitting positive urinalysis tests when her consistent failure to submit to testing violated the reintegration plan she was tasked with completing.

As for inpatient drug treatment, the only evidence that supports Mother's argument is her own testimony at the termination hearing. This testimony does not discount the fact that she had to complete multiple drug and alcohol evaluations due to her lack of participation. In other words, she would get an evaluation, not follow through, and then have to get another one. Nor does it discount the fact that she had other areas of the reintegration plan that she had not completed. For example, due to Mother's inability to comply with urinalysis testing or complete inpatient treatment, her visits with the children have always been supervised at KVC.

Were Mother to complete inpatient treatment, she would still have to obtain stable housing, provide KVC with a lease so they could perform a walkthrough of the residence, progress through the various stages of visitation with KVC, obtain a job to have income, obtain a driver's license, provide KVC with proof of the license, and provide KVC with proof of a vehicle registration and insurance information. That is not to say these tasks could not be completed, but given the history of the case, the district court did not believe Mother could complete them in the foreseeable future. Considering the evidence, this conclusion is reasonable and supported by the evidence.

By the termination hearing, nearly 20 months had passed since DCF took custody of the children. Throughout the case, Mother has consistently shown she will not comply with urinalysis testing. And though she argues she will soon begin inpatient treatment, she had never started the program despite having months to do so. As a result, Mother would be unable to reintegrate the children into her home in the foreseeable future, especially when viewed in "child time." Thus, the district court did not err by concluding Mother's conduct or condition, and thus her unfitness, was unlikely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a). Clear and convincing evidence supports its finding.

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN HOLDING THAT TERMINATION OF MOTHER'S PARENTAL RIGHTS WAS IN THE BEST INTERESTS OF HER CHILDREN

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1). This decision is within the sound discretion of the district court, and the district court makes that decision based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1115-16.

We review the district court's decision for an abuse of discretion. 50 Kan. App. 2d at 1116. A district court exceeds its broad latitude if its ruling is based on an error of law, an error of fact, or is arbitrary, fanciful, or unreasonable. *In re C.T.*, 61 Kan. App. 2d 218, 227, 501 P.3d 899 (2021). Since Mother does not point to an error of law or fact, the question becomes whether no reasonable district court would come to the same conclusion. See *In re R.S.*, 50 Kan. App. 2d at 1116.

25

Here the district court was presented evidence that both Ellis and the guardian ad litem believed termination was in the best interests of children. H.C. had gone from being truant and making Ds and F's to making straight A's in school while in foster care. The guardian ad litem argued that the parents had failed to meet children's needs. The district court agreed.

"The Court will further find that it is in the best interest of all three children for [Mother's] parental rights to be terminated. The Court has considered the physical, mental and emotional needs of each child. Termination of [Mother's] parental rights is in the best interest of each child, and the physical, mental or emotional needs of each child would best be served by terminating [Mother's] parental rights. The Court finds, based on the evidence presented today, that the parental rights of [Mother] are terminated."

Although district court's written journal entry did not supply any additional rationale for this conclusion, the district court made extensive findings regarding the failure of Mother to care for her children and the consequences at the conclusion of the hearing on the record.

Mother argues that based on this court's analysis in *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010), that the district court's finding was insufficient and lacked the necessary specificity. We disagree and find *In re K.R.* clearly distinguishable from the facts here. As noted by the panel in *In re K.R.*, the State failed in establishing every factor necessary for termination of parental rights.

"There are no allegations of abuse, no allegations of addiction, no allegation of filthy living conditions, no allegations of a dangerous relationship with a boyfriend, and no allegations of lack of interest in the children. Instead, mother's apparent relationship with the children led to a strong plea from the guardian ad litem to reunite the family." 43 Kan. App. 2d at 904-05.

26

In addition, in *In re K.R.*, there was a strong expressed desire by the children to return to the custody and home of their mother. Although the court mentioned mother's shortcomings, it never made *any* specific finding regarding the best interests of the children. This is not only required by statute but was particularly crucial in *In re K.R.* where the evidence did not support terminating parental rights and was contrary to the recommendations of the guardian ad litem.

In a more recent case, similar to *In re K.R.*, this court again found that the district court abused its discretion in finding termination to be in the best interest of the child because the record was devoid of *any* evidence to support the finding—not because the language used by the court was not specific enough. *In re T.H.*, 60 Kan. App. 2d 536, 556-57, 494 P.3d 851, *rev. denied* 314 Kan. 855 (2021). Like in *In re K.R.,* the court found that *none* of the factors necessary to establish unfitness were present. The case worker agreed that there was a close bond between father and child and that father had done everything asked of him as part of the reintegration plan. There had been no allegations of abuse or neglect with regards to father. The evidence simply did not support such a finding.

This case is clearly distinguishable. Here, the district court did make specific findings indicating that it had fully considered the physical, mental, and emotional needs of each child and the record supported that it had done so.

The evidence supported a finding that Mother was abusing drugs and refusing to seek help—even though she knew it was a prerequisite to having her children returned to her care. The court accepted the allegations in the petition that Mother had physically and sexually abused children. The evidence supported the court's findings that Mother would not obtain employment to help support her family financially, that Mother would not do what was necessary to obtain legal transportation, that Mother failed to properly feed or clean her children, and that Mother could not provide a stable home for her children. In

27

addition, Mother could not keep her oldest child in school and drug free while she had custody. The Father's parental rights had been terminated for similar issues including Father's continued use of methamphetamine, and Mother and Father continued to live together. And more importantly, the evidence supported a finding that away from Mother, the children were not being physically and sexually abused, were fed and clean, and had stable housing. The oldest child was not doing poorly in middle school but getting straight A's. The case worker and the guardian ad litem who had contact with children both testified that it was in the best interests of the children to have parental rights severed. Accordingly, we find that the district court properly considered the physical, mental, and emotional needs of children in determining their best interests, and a preponderance of the evidence supported the finding that it was in the children's best interests that Mother's parental rights be terminated.

Affirmed.