NOT DESIGNATED FOR PUBLICATION

No. 124,854

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.J.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL J. HOELSCHER, judge. Opinion filed October 28, 2022. Reversed and remanded with directions.

*Laura E. Poschen*, of Law Office of Laura E. Poschen, of Wichita, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., SCHROEDER and WARNER, JJ.

PER CURIAM: In this appeal, the natural father of A.J. challenges the district court's decision to terminate his parental rights. The district court found that the appellant, whom we call Father, was unfit to parent A.J. and would remain unfit for the foreseeable future because he had not adjusted his circumstances to care for his daughter. These findings were largely rooted in the fact that Father, who has an extensive criminal history, was arrested for and charged with additional crimes while this case was pending. After reviewing the unique facts of this case and the parties' arguments, we find the evidence was sufficient to show Father was unfit to parent A.J. at the time of the termination hearing. But the court erred when it found, based on the record before it, that Father's unfitness was unlikely to change for the foreseeable future because the pending charges against Father remained unresolved. We thus reverse the court's termination decision and remand for further proceedings.

1

FACTUAL AND PROCEDURAL BACKGROUND

A.J. was born in September 2019. A.J.'s mother, whom we call Mother, had three other children at the time. She did not tell A.J.'s suspected Father—who is not the father to any of Mother's other children—that she was pregnant, that Father was the father of the child, or that A.J. was born. The two were not dating or married; they had a brief sexual relationship but had since lost contact. And though they had known each other since childhood, Mother chose not to tell Father about A.J. because she did not think he would want to be involved with the child.

The State had initiated proceedings regarding the placement and care of Mother's three other children—who all had different fathers—in 2017 due to Mother's substance abuse, housing instability, and general difficulty in providing necessary care. The oldest child eventually reintegrated with that child's father, and the State closed her case. Mother's other two children, both young boys, were adjudicated children in need of care (CINC). A few months before A.J.'s birth, the State placed the boys back with Mother, though their CINC cases remained pending.

In February 2020, Mother tested positive for drugs so the State again removed the two boys—along with A.J., who was then about five months old—from Mother's care. All three children tested positive for methamphetamines. Mother informed the agency overseeing A.J.'s CINC case that Father—who was still unaware that he had a baby daughter—was A.J.'s biological father and that Mother was not in contact with him. A few weeks later the agency, Saint Francis Ministries, began trying to find Father by searching the internet and sending letters to possible addresses.

After receiving one of the letters, Father contacted Saint Francis in April 2020 and learned, for the first time, that A.J. might be his daughter. He requested paternity testing

but explained that if he was indeed A.J.'s father, he wanted to be involved in her life. The district court ordered genetic testing a few days later. Although his paternity was not yet confirmed, Saint Francis encouraged Father to begin completing tasks and court orders immediately because A.J.'s CINC case, which was consolidated with A.J.'s brothers' cases that had been pending for almost three years, was moving quickly.

When Father had this initial conversation with Saint Francis, he was working full time at a job he had maintained for three years. He also shared custody of his 14-year-old daughter, though he was going through a divorce.

Other parts of Father's life were significantly more turbulent. Father had been convicted of several crimes in the previous decade. Between 2008 and 2017, Father had spent over eight years in prison. He also had multiple criminal charges pending against him in 2020 when he first discussed his paternity with Saint Francis:

- In 2018, Father's then-wife obtained a protection-from-abuse order against him, alleging he physically abused her. She later agreed to dismiss her request, and the order was released. The City of Kechi filed criminal charges against Father related to this incident in municipal court, and these charges remained pending in 2020.

- In early 2020 (before Father knew about A.J.), Father's then-wife and two nonfamily members obtained temporary protection orders against Father for allegations involving firing a gun and making threats. The State charged Father with 10 crimes related to this incident and other alleged domestic-violence incidents from 2019.

With his past convictions, Father had a criminal-history score of A for sentencing purposes. Thus, any future conviction would carry a presumptive prison sentence. See K.S.A. 2021 Supp. 21-6804(a); K.S.A. 2021 Supp. 21-6805(a).

Father submitted a DNA sample in May 2020—the month after his initial conversation with Saint Francis—to complete the paternity test. While the results were pending, Father appeared at a CINC adjudication hearing for A.J. and entered a no-contest stipulation, agreeing that A.J. was currently in need of the State's care. A.J.'s DNA sample was submitted in mid-June 2020, and a few days later the paternity test confirmed that A.J. was his daughter. For reasons that are not clear from the record, Father did not receive the results of his paternity test until late July 2020.

Months before his paternity was confirmed, Saint Francis caseworkers asked Father to submit to drug testing, indicating that any missed drug tests would count as positive tests. Father submitted drug tests in May 2020, about the same time he provided his DNA for the paternity test. His urinalysis was negative for drugs, but a hair-follicle test was positive for methamphetamines and cocaine.

After Father received the test results confirming his paternity, he became significantly more involved in the ongoing CINC case. He was still maintaining his same full-time job and had added a part-time evening job. Saint Francis noted he was "doing well" with court orders. He completed a substance-abuse evaluation that recommended him for level-one outpatient treatment, and he began looking for a treatment facility.

Father also successfully began in-person visits with A.J. In the month after he learned of the paternity-test results, Father had three supervised visits with A.J. that all went well. Father fed A.J. and changed her diaper, with the caseworkers noting that Father interacted naturally with A.J., and she smiled at him. Father also bought clothes for A.J. and a crib. He had a home, had begun parenting classes, and was prepared to start drug classes.

4

Father also completed more drug tests. He submitted multiple urinalyses that were all negative. But he missed four urinalyses—three before his paternity was confirmed and one after. In early August 2020, Father submitted a negative urinalysis, but his hair-follicle test the same day was again positive for cocaine. He denied using cocaine but attributed the positive test to an ecstasy pill he had taken previously, though he did not indicate when that occurred. Father attributed both positive hair-follicle tests—in May 2020 and August 2020—to the ecstasy pill.

During the month after Father confirmed his paternity, the caseworkers overseeing A.J.'s case indicated Father was "fully engaged" and making progress towards his case-plan goals. But about a month after he received the paternity-test results, Father was arrested on allegations that he committed new crimes. The State charged him with misdemeanor domestic battery, criminal possession of a weapon, unlawful discharge of a firearm, and three counts of aggravated assault. Though not in the charging documents, the record suggests that Father also faced a kidnapping-related charge.

After this arrest, Father remained in jail for the rest of the district-court proceedings in A.J.'s case. As a result, he no longer had any visits with A.J. and was unable to make other progress on other court-ordered tasks. He never completed his parenting classes, which were not offered at the jail during the COVID-19 pandemic, or his recommended outpatient drug treatment.

But Father continued to communicate with Saint Francis from jail. He wrote several letters to caseworkers and spoke with a caseworker on the phone, expressing a desire to continue being involved in the case and to eventually obtain custody of his daughter. The agency informed him that it wanted to help him complete court orders while he was incarcerated, but Father explained that the jail was not offering any classes because of the pandemic. Still, Saint Francis described Father as "very committed to getting out and wanting to parent his daughter."

5

For its part, Saint Francis caseworkers sent Father monthly parent letters, spoke with him on the phone once, and mailed him pictures of A.J. and a copy of the case plan in spring 2021. The agency contacted some of Father's family members to explore other placements for A.J., but only after he repeatedly requested it do so and provided contact information. Other members of Father's family contacted Saint Francis first. Father's girlfriend also contacted Saint Francis to obtain a background check and be available as a resource for A.J. In one letter, Father expressed frustration that Saint Francis had not contacted his girlfriend or family members. Saint Francis ultimately determined none of Father's family members were viable placement options.

The district court held a permanency hearing in November 2020 and determined reintegration was no longer viable for A.J., though Father continued to assert a desire to be a part of her life. A month later, the State moved to terminate Father's parental rights. The district court then held a review hearing, consolidating A.J.'s proceedings into her brothers' upcoming termination hearing, which was already set to take place in a few months. At that time, the CINC case involving A.J.'s brothers had been pending for three years. A.J. was 15 months old; Father had been aware of A.J.'s existence for about 7 months and had known A.J. was his daughter for 5 months.

In late April 2021, a preliminary hearing was held on Father's pending charges in the two separate criminal cases from the year before. In both cases, the court found probable cause to proceed and bound Father over for trial. Father remained in custody awaiting arraignment and a trial date.

The hearing on the State's motions to terminate the parental rights in all three children's cases took place about two weeks later, in May 2021—about 15 months after A.J. was removed from Mother's home, 10 months after Father learned of his paternity, and 9 months after Father's arrest. The two-day hearing involved several interested

parties: the three children—A.J. and her two half-brothers—and their parents—Father, Mother, and the father to one of A.J.'s brothers (the remaining father relinquished his parental rights before the hearing). At the beginning of the hearing, the court granted Father's motion to represent himself and allowed his counsel to withdraw from the case, though the attorney remained in the courtroom as standby counsel if Father changed his mind or had questions.

Not surprisingly given the differences in the duration of the cases, most of the evidence presented at the hearing focused on Mother, the other father, and A.J.'s brothers. Father testified briefly as part of the State's case-in-chief at the beginning of the hearing, discussing his visits with A.J., his criminal history, and his positive hair-follicle tests. Father also cross-examined some witnesses, eliciting testimony that Mother had not told him about A.J. and that, upon learning of his paternity, he was completing tasks and making progress before his arrest. At the end of the hearing, Father provided narrative testimony regarding the steps he had taken to comply with the case plan and his desire be part of A.J.'s life. He claimed that he was innocent of his pending charges and would not be convicted at trial; if he were released from custody, he had his same full-time job awaiting him and would be able to care for A.J.

The district court terminated the parental rights of all three remaining parents. Consistent with the evidence, most of the district court's explanation concerned Mother and the father of one of A.J.'s brothers. But the court also made factual findings relating to Father's criminal history, current pending charges, and two positive drug tests. Based on these findings, the court found Father unfit to parent A.J. because he had not adjusted his circumstances so he could care for her. The court also found that Father's unfitness was unlikely to change for the foreseeable future and that termination was in A.J.'s best interests. The court therefore terminated Father's parental rights. Father appeals.

DISCUSSION

A parent has a constitutionally protected liberty interest in the relationship with his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Before terminating parental rights, Kansas law requires a district court to find the State has proved that the parent is unfit, that the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and that termination of parental rights is in the children's best interests. K.S.A. 38-2269(a), (g)(1). Because of the fundamental nature of this right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the evidence is sufficient to support the court's decision—that is, whether a rational fact-finder could have found it highly probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. Appellate courts do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

If a district court finds that a parent is unfit, the court must then determine whether the parent's unfitness is likely to change in the foreseeable future. K.S.A. 38-2269(a). A court evaluates the foreseeable future from a child's perspective because children have a different perception of time. *In re R.S.*, 50 Kan. App. 2d at 1117. For a child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 38-2201(b)(4).

In its initial ruling from the bench, the district court found five statutory factors pointed to Father's unfitness. Three of these factors—K.S.A. 38-2269(b)(7), (b)(8), and

(c)(3)—related to Father's failure to adjust his circumstances to conform to the case plan and to allow him to care for A.J. The court also found at the hearing that Father's drug use rendered him incapable of caring for A.J.'s needs. K.S.A. 38-2269(b)(3). And even though Father's pending criminal cases had not yet been resolved, the court emphasized that Father was presently in jail and had an extensive criminal history; the court thus found that Father was also unfit under K.S.A. 38-2268(b)(5) ("conviction of a felony and imprisonment").

The district court's journal entry refined this ruling and listed only the first three of these factors as bases for its finding of unfitness: K.S.A. 38-2269(b)(7) (failure of reasonable reintegration efforts), K.S.A. 38-2269(b)(8) (lack of effort by Father), and K.S.A. 38-2269(c)(3) (failure to carry out reintegration plan). Father points out—and the State concedes—that the court's initial finding under K.S.A. 38-2269(b)(5) was improper, as the State did not include that consideration in its termination motion. See *In re K.H.*, No. 121,364, 2020 WL 2781685, at *7 (Kan. App. 2020) (unpublished opinion) (terminating parental rights for reasons not listed in the State's motion potentially violates the parent's due-process rights because the parent lacks notice and an opportunity to meaningfully refute such allegations). The court's journal entry also omitted the earlier finding regarding Father's drug use, limiting the drug-related findings to Mother and the father of A.J.'s brother.

We limit our review to the findings articulated in the district court's journal entry. Accord K.S.A. 38-2273(c) (incorporating Kansas civil procedure relating to appeals); K.S.A. 2021 Supp. 60-2103(a) (appeals are taken from the journal entry of judgment). A valid finding under any one of the factors in K.S.A. 38-2269, standing alone, may support an unfitness determination. K.S.A. 38-2269(f).

After reviewing the record, we conclude there is evidence supporting a finding that Father was unfit at the time of the termination hearing. Father had an extensive

9

criminal history, and he had been arrested in August 2020 and charged with multiple crimes. Father remained in jail at the time of the termination hearing about nine months later; he had no communication with A.J. during this time. As another panel of this court has noted, someone "cannot parent their children in any conventional sense while they are incarcerated. They are unable to provide a home and typically cannot offer meaningful financial or emotional support under those circumstances." *In re S.T.*, No. 121,376, 2019 WL 6795836, at *3 (Kan. App. 2019) (unpublished opinion). There was evidence to support the district court's finding that the caseworkers' efforts had not succeeded due to Father's failure to conform to the case plan and to adjust his circumstances to care for A.J.

But a finding that Father was unfit at the time of the termination hearing does not necessarily compel a finding that this unfitness will continue for the foreseeable future. See 2019 WL 6795836, at *4. The district court did not articulate at the hearing why it believed Father's unfitness would remain unchanged, and the journal entry merely noted this finding. Ordinarily, when a party does not object to the adequacy of a district court's findings of fact or conclusions of law, an appellate court may presume the district court found all facts necessary to support its judgment. *State v. Jones*, 306 Kan. 948, 959, 398 P.3d 856 (2017). The unique facts of this case cause us to take a different path.

The basis for the district court's findings of unfitness related to Father's failure to adjust his circumstances to complete the case plan and care for his daughter. The evidence presented at the termination hearing showed that Father's inability to complete these tasks was the result of his arrest and incarceration in jail during a pandemic. Indeed, in the month after he confirmed he was A.J.'s father but before his arrest, the parties agreed that Father made significant progress toward reintegration. And Father consistently communicated with Saint Francis, even when his incarceration prevented him from completing reintegration tasks, and he remained committed to staying involved in the case.

10

Though the district court's unfitness findings concerned the failure of Saint Francis' reasonable efforts to reintegrate the family and Father's lack of efforts to adjust his circumstances, its discussion at the termination hearing focused almost entirely on Father's pending charges and criminal history. While these facts may provide evidence of current unfitness, they do not, by themselves, show by clear and convincing evidence that Father's unfitness is unlikely to change for the foreseeable future.

Although Father remained jailed during the termination hearing, there was no evidence presented at the hearing as to how long he might remain there. Father had not been convicted of any of the charged crimes and was still awaiting a trial date. And other than the charging documents listing the pending charges, the State presented no evidence at the hearing about the events leading to his arrest and current criminal cases. There thus existed several possibilities for how those cases may be resolved. Father might be convicted of the charges and sentenced to a prison term, as the district court apparently assumed would occur. But Father might also *not* be convicted of those charges after a trial, or the charges might be resolved through a plea or in some other way.

It is true, as the district court noted, that Father has an extensive criminal history and had been charged with committing additional crimes. And previous decisions of this court have found that, in some circumstances, a parent's past conduct may serve as a predictor of future behavior. *In re M.S.*, 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). But a criminal history is not, in and of itself, a reason to terminate a person's parental rights. See K.S.A. 38-2269. And past criminal conduct does not, standing alone, prove that Father committed the crimes for which he has been charged.

With these unknowns surrounding Father's pending charges (the main basis for the district court's unfitness findings), the State had not shown by clear and convincing

11

evidence that Father's lack of effort—a result of his being in jail—was unlikely to change in the foreseeable future. Without more information, it was too early for the district court to make a foreseeable-future determination that relied on the pending charges alone.

The circumstances surrounding the termination hearing also give us pause. At the time of the hearing, the CINC cases involving A.J.'s brothers had been pending for over three years. Most of the evidence at the hearing concerned Mother's drug abuse and other misconduct during that lengthy period, as well as the conduct of the father to one of the boys. More than three years over the course of young boys' lives is significant, and the district court's foreseeable-future assessment for Mother and the other parent was thus well founded. In contrast, Father had known about A.J.'s existence for only about a year and had known he was A.J.'s father for 10 months. A.J. was under two years old. The district court did not explain what effect, if any, these differences played in its termination decision in Father's case. See K.S.A. 38-2201(b)(4); *In re M.S.*, 56 Kan. App. 2d at 1263 (discussing child time).

Under these circumstances, and faced with such facts, there is a natural risk of logrolling findings—of inadvertently allowing the facts of A.J.'s brothers' cases to influence the court's decision regarding Father. When consolidated cases involve multiple children, parents, and factual considerations, a district court should take care not to allow the factual circumstances of one case to influence its overall findings. After reviewing the record here, we cannot say with confidence that the court separated its assessment of the other parents' conduct and the facts related to their children's cases over the last four years from its analysis of Father's individual situation and A.J.'s case.

Thus, under these unique facts, we find that the district court erred when it found that the State presented clear and convincing evidence that Father's unfitness was

unlikely to change in the foreseeable future. We find ourselves compelled to this conclusion due to the limited findings by the district court related to future unfitness.

We pause before closing to emphasize a few points for consideration on remand. First, given our assessment of the district court's finding regarding Father's continued unfitness, we need not and do not consider the court's conclusion that termination was in A.J.'s best interests. Nor do we disagree with the court's conclusion that Father's criminal history is troubling. The outcome of Father's current pending charges may very well indicate an unwillingness or inability to conform with reintegration tasks and reform his criminal behavior that will continue into the foreseeable future, even though the stakes included the loss of any continuing relationship with his daughter. But the State and Father must be given the opportunity to present evidence regarding those pending cases so the court may make findings regarding his future fitness as a parent.

Second, A.J. remains a child in need of care. We have not disturbed that ruling. Nor have we reversed the district court's findings that Father was unfit at the time of the termination hearing because of his incarceration and lack of communication with A.J. The record does not reflect the status of Father's pending criminal cases or whether he is still in jail and unfit.

The district court on remand should assess whether A.J. continues to be in need of care. A.J. should remain in the legal custody of the Kansas Department for Children and Families and in the physical custody of her present placement while the assessment takes place. Depending on the circumstances, the district court may then consider either a revised family reintegration plan or a new termination hearing.

Reversed and remanded with directions.

13